AVALONBAY COMMUNITIES, INC., ET AL. *v.*
TOWN OF ORANGE ET AL.
(SC 16352)

Borden, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued February 16—officially released July 10, 2001

*Timothy P. Pothin* and *Thomas R. Gerarde*, with whom were *Brian M. Stone* and, on the brief, *Hugh F. Keefe* and *I. Milton Widem*, for the appellants-appellees (defendants).

*Joseph P. Williams*, with whom were *Timothy S. Hollister* and, on the brief, *Christopher B. Carveth* and *Leo P. Carroll*, for the appellees and the cross appellant (plaintiffs).

*Wesley W. Horton* filed a brief for the Connecticut Civil Liberties Union Foundation et al. as amici curiae.

*Opinion*

BORDEN, J. The defendants[1] appeal[2] and the named plaintiff, AvalonBay Communities, Inc. (AvalonBay),

---

[1] The plaintiffs brought the first count of their amended complaint against all of the following defendants: the town of Orange (town); the town board of selectmen (board of selectmen); Joseph F. Blake, Albert M. Clark III, Mitchell R. Goldblatt, Patricia M. Pearson and Laura J. Reid, members of the board of selectmen; the town economic development commission (economic development commission); Gregory J. Mulherin, Roger Boyd, William R. Fuhlbruck, Frank W. Rogers and Judy Zimmerman, members of the economic development commission; the town board of finance (board of finance); J. Phillip Smith, John M. Cifarelli, Patrick Fremont, Deborah C. Hoffman, Brendan E. Williams and AnneMarie Paone-Mullin, members of the board of finance; Orange Economic Development Corporation, Inc.; Robert C. Sousa, the first selectman of the town and a member of the board of selectmen; and Patrick O'Sullivan, the town clerk. Count two of the amended complaint was brought against the town, the board of selectmen, the economic development commission, the board of finance, the Orange Economic Development Corporation, Inc., O'Sullivan and all members of the defendant agencies in their official capacities. The third count of the amended complaint was brought against the town, the board of selectmen, the economic development commission, Sousa in his official and individual capacities, and all members of the board of selectmen and of the economic development commission in their official capacities. For clarity, our reference to "the defendants" throughout this opinion is only to those defendants involved in the specific count that we address in the context of the reference. For example, in part I of this opinion, we address count one of the amended complaint and, therefore, "the defendants" refers only to the defendants in count one.

[2] The defendants appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

cross appeals[3] from the judgment of the trial court, *Curran, J.*, rendered after a court trial, granting a permanent injunction in favor of the plaintiffs, Ernest Cuzzocreo, Jr., Cuzz-Acres Orange Limited Partnership (Cuzz-Acres) and AvalonBay. In their appeal, the defendants claim that the trial court improperly enjoined the town from: (1) implementing its plans for an industrial park (project plan) in the town, to be located on a parcel that included a parcel of real property owned by AvalonBay (AvalonBay parcel); and (2) proceeding with any plans for the taking by eminent domain of the AvalonBay parcel. In its cross appeal, AvalonBay claims that the trial court improperly concluded that the plaintiffs were not entitled to damages for any allegedly improper conduct by the town under federal and state fair housing laws. We conclude that: (1) the trial court properly enjoined the town from proceeding with the project plan; (2) the issue of the taking of the AvalonBay parcel has been rendered moot; and (3) the trial court properly found in favor of the defendants with respect to AvalonBay's fair housing claims. Accordingly, we affirm the judgment in part.

The trial court found the following facts. In May, 1997, the plaintiffs entered into a contract whereby AvalonBay was to purchase a parcel of real property located in the town owned by Cuzzocreo and Cuzz-Acres, comprised of approximately 9.6 acres of land. At the time of the purchase agreement, the parcel was located in a district zoned light industrial, which specifically allowed planned residential developments, including affordable housing projects in accordance with General Statutes § 8-30g.[4] Subsequently, in August,

---

[3] AvalonBay cross appealed from the judgment of the trial court to the Appellate Court, and we transferred the cross appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

[4] We assume that the trial court's reference in its memorandum of decision to General Statutes § 8-30 is simply a typographical error.

1997, AvalonBay filed applications for a wetlands permit and a special use permit, accompanied by a site plan, seeking approval to build on the parcel a luxury apartment complex, a percentage of which would qualify as affordable housing rental units. The town inland wetlands and watercourses commission denied AvalonBay's original and revised wetlands permit applications. The town plan and zoning commission denied AvalonBay's site plan and special use permit application, as well as its subsequent, modified application.[5] Approximately three weeks after AvalonBay's application was filed, the plan and zoning commission issued a moratorium on all planned residential developments in the town, effective September 26, 1997. In April, 1998, while AvalonBay's appeal from that decision of the plan and zoning commission was pending,[6] the town economic development commission hired the planning firm of DeCarlo & Doll, Inc., to draft a project plan for a high-tech industrial park that would occupy eighteen

[5] AvalonBay appealed from the decision of the plan and zoning commission to the Superior Court. The trial court, *Munro, J.*, sustained AvalonBay's appeal under § 8-30g and ordered that the plan and zoning commission approve the modified application for a special permit and site plan pending any reasonable and necessary conditions imposed by that commission. See *AvalonBay Communities, Inc.* v. *Plan & Zoning Commission*, Superior Court, judicial district of New Britain at New Britain, Docket No. CV 98-0492246 (August 12, 1999). AvalonBay also appealed from the decision of the inland wetlands and watercourses commission to the Superior Court. The trial court, *Munro, J.*, sustained AvalonBay's appeal and ordered that the inland wetlands and watercourses commission approve the wetlands permit application subject to appropriate and reasonable conditions imposed by that commission. See *AvalonBay Communities, Inc.* v. *Inland Wetlands & Watercourses Commission*, Superior Court, judicial district of New Britain at New Britain, Docket No. CV 98-0492660 (August 12, 1999).

[6] AvalonBay appealed to the Superior Court from the decision of the plan and zoning commission amending the town's zoning regulations to prohibit planned residential developments in areas zoned as light industrial districts. The trial court, *Munro, J.*, dismissed AvalonBay's appeal, concluding that there existed a rational relationship between the amendments and the town's legitimate zoning goals. See *AvalonBay Communities, Inc.* v. *Plan & Zoning Commission*, Superior Court, judicial district of New Britain at New Britain, Docket No. CV 98-0492239 (August 13, 1999).

separate parcels of real property on a 172 acre plot in the town, which would include the AvalonBay parcel. In September, 1998, Orange Economic Development Corporation, Inc., a private corporate entity, was formed to oversee the proposed industrial park.

Before the project plan was completed, plans were formed to take the parcel by eminent domain. In November, 1998, however, the voters of the town rejected the proposed issuance of bonds for the acquisition of the parcel. Plans for the industrial park, however, continued. In December, 1998, the board of selectmen passed a resolution for the issuance of bonds for the condemnation of the parcel. The project plan was approved by the economic development commission in January, 1999,[7] and by the board of selectmen in February, 1999. On March 9, 1999, the plan to take the parcel by eminent domain was revived and approved by the economic development commission. The following day, the board of selectmen voted to condemn the parcel. At a town meeting on March 29, 1999, the taking of the AvalonBay parcel by eminent domain for its inclusion in the industrial park was approved. Additional facts will be provided as necessary.

The plaintiffs brought this action against the defendants, seeking a permanent injunction against the project plan and the taking of the AvalonBay parcel by eminent domain, and also seeking to recover damages from the town and various individual defendants.[8] In the first count of a second amended five count complaint, the plaintiffs alleged that the defendants' proposed implementation of the project plan "violates §§ 7-136 and 7-148 and Chapters 132 or 588*l* of the General

---

[7] The economic development commission serves as the development agency for the town.

[8] We note that at the time of trial, the AvalonBay parcel comprised two separate parcels, owned jointly by Cuzzocreo and Cuzz-Acres. Prior to the trial court's judgment, title to both of those parcels had passed to AvalonBay.

Statutes, does not constitute a bona fide plan for a municipal development project, constitutes a bad faith exercise of the authority granted to municipalities by these statutes, and constitutes ultra vires action by the Town and its agencies . . . ." In the second count of the amended complaint, the plaintiffs alleged that the intended condemnation of the parcel violated article first, § 11, of the Connecticut constitution,[9] in that it was not being carried out to serve a public use. The plaintiffs also alleged that the intended condemnation constituted a bad faith exercise of the eminent domain power. The plaintiffs further alleged that the intended condemnation was unlawful because it was violative of several federal and state fair housing statutes. In the third count of the amended complaint, the plaintiffs alleged that the defendants violated certain federal and state fair housing laws. In the fourth count of the amended complaint, the plaintiffs sought to recover compensatory and punitive damages from Robert C. Sousa, the first selectman of the town, in his individual capacity, for tortious interference with business expectancies. The plaintiffs alleged that Sousa had been aware of the contract between AvalonBay as the purchaser and Cuzzocreo and Cuzz-Acres as the sellers of the parcel, and that he had acted outside the scope of his duties and employment as first selectman by improperly blocking the plaintiffs' residential development efforts. Finally, the fifth count of the amended complaint constituted a claim for indemnification of the plaintiffs by the town with respect to the third and fourth counts. The defendants asserted eight special defenses, which are not involved in this appeal.

On March 26, 1999, the defendants removed the action to the United States District Court for the District

---

[9] Article first, § 11, of the Connecticut constitution provides: "The property of no person shall be taken for public use, without just compensation therefor."

of Connecticut. That court concluded that the complaint failed to allege a substantial federal question, thereby depriving the court of subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Accordingly, the federal court remanded the action to the Superior Court pursuant to its authority under 28 U.S.C. § 1447 (c). The trial court issued a stay of the condemnation pending the resolution of the plaintiffs' application for an injunction.

After a court trial, the defendants moved to dismiss count two of the plaintiffs' second amended complaint for lack of subject matter jurisdiction on the ground of mootness. The defendants argued that count two, which sought an injunction against the taking of the parcel, was rendered moot because: (1) the town's authorization for the condemnation had expired in September, 1999; (2) the board of selectmen had determined that it was no longer in the town's best interest to acquire the parcel following a then recent reappraisal, and had resolved that it would not vote to acquire the parcel by eminent domain so long as AvalonBay owned the property; and (3) the economic development commission had resolved not to seek the acquisition of the parcel and to amend the project plan so as to delete the acquisition therefrom. In February, 2000, the trial court denied the defendants' motion to dismiss, reasoning that the resolution lacked the permanent force of a judgment and applied specifically to AvalonBay without taking into consideration future transfers of ownership.

At the same time, the trial court ruled on the merits of the case, concluding that, as a general matter, an industrial park, such as the one proposed by the town, may serve a public purpose for which the power of eminent domain could be exercised. Although the court found that there was no evidence that the property to be taken for the industrial park would be used for anything other than the stated purpose, the court also

found that the town had proceeded in bad faith and that the project plan was a pretext in an effort to thwart affordable housing on the AvalonBay parcel. In making these findings, the court principally relied on the timing of and the sparsity of detail in the project plan, as well as the actions and statements of Sousa and other town officials.

On the basis of these findings, the trial court concluded, with respect to the first and second counts, that the plaintiffs were entitled to a permanent injunction prohibiting the town from proceeding with the implementation of the project plan and from proceeding with any plans for the condemnation of the subject property. With respect to the third count, the trial court concluded that the plaintiffs were not entitled to damages for any allegedly improper conduct by the town under either the federal or state fair housing laws. Accordingly, the trial court rendered judgment in favor of the plaintiffs on the first and second counts of the amended complaint, and in favor of the defendants on the third count.[10] This appeal and this cross appeal followed.

Before reaching the defendants' claims on appeal and AvalonBay's claim on the cross appeal, we briefly address the applicable standard of review. "The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record. . . . *Torres* v. *Waterbury*, 249

---

[10] The trial court also rendered judgment in favor of the defendants on the fourth and fifth counts of the amended complaint. The judgment on those counts is not involved in this appeal.

Conn. 110, 118–19, 733 A.2d 817 (1999)." (Internal quotation marks omitted.) *Olson* v. *Accessory Controls & Equipment Corp.*, 254 Conn. 145, 156, 757 A.2d 14 (2000).

We also set forth "the governing principles for our standard of review as it pertains to a trial court's discretion to grant or deny a request for an injunction: A party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law. . . . A prayer for injunctive relief is addressed to the sound discretion of the court and the court's ruling can be reviewed only for the purpose of determining whether the decision was based on an erroneous statement of law or an abuse of discretion. . . . *Walton* v. *New Hartford*, 223 Conn. 155, 165, 612 A.2d 1153 (1992). Therefore, unless the trial court has abused its discretion, or failed to exercise its discretion; *Wehrhane* v. *Peyton*, 134 Conn. 486, 498, 58 A.2d 698 (1948); the trial court's decision must stand." (Internal quotation marks omitted.) *Advest, Inc.* v. *Wachtel*, 235 Conn. 559, 562–63, 668 A.2d 367 (1995). "The extraordinary nature of injunctive relief requires that the harm complained of is occurring or will occur if the injunction is not granted. Although an absolute certainty is not required, it must appear that there is a substantial probability that but for the issuance of the injunction, the party seeking it will suffer irreparable harm." *Karls* v. *Alexandra Realty Corp.*, 179 Conn. 390, 402, 426 A.2d 784 (1980).

I

We first consider the defendants' claim that the trial court improperly enjoined the town from implementing the project plan. Specifically, the defendants argue that: (1) the plaintiffs lacked standing to challenge the adoption or implementation of the project plan; and (2) the plaintiffs are not entitled to an injunction with respect

to the project plan. We address, and reject, these arguments in turn.

## A

We first address the defendants' claim that the plaintiffs lacked standing to challenge the adoption or implementation of the project plan.[11] Specifically, the defendants argue that: (1) the plaintiffs failed to allege and prove that the adoption of the project plan threatens or inflicts a direct injury upon them; (2) nothing in chapters 132 and 588*l* of the General Statutes, which pertain to the adoption and implementation of municipal development project plans, expressly creates a private right of action to challenge the terms, the substantive adequacy or the procedures employed in adopting such plans; and (3) the plaintiffs are not afforded a private right of action by implication. The plaintiffs argue, to the contrary, that they have standing to challenge the project plan because they are aggrieved by its adoption and intended implementation. We agree with the plaintiffs. We base our conclusion on (1) the statutory framework governing municipal development project plans, coupled with (2) the trial court's factual findings that the defendants acted in bad faith in their effort to prevent the development of affordable housing on the AvalonBay parcel.

"The issue of standing implicates this court's subject matter jurisdiction." *Fish Unlimited* v. *Northeast Utilities Service Co.*, 254 Conn. 21, 31, 755 A.2d 860 (2000); *Steeneck* v. *University of Bridgeport*, 235 Conn. 572, 580, 668 A.2d 688 (1995) ("[w]here a plaintiff lacks standing to sue, the court is without subject matter jurisdiction"). "Standing is the legal right to set judicial

---

[11] Although the defendants challenge the plaintiffs' standing with respect to this claim for the first time on appeal, we nonetheless address it because it involves subject matter jurisdiction. *Fink* v. *Golenbock*, 238 Conn. 183, 199, 680 A.2d 1243 (1996).

machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . *Gay & Lesbian Law Students Assn.* v. *Board of Trustees,* 236 Conn. 453, 466, 673 A.2d 484 (1996). When standing is put in issue, the question is whether the person whose standing is challenged is a proper party to request an adjudication of the issue . . . . *Malerba* v. *Cessna Aircraft Co.,* 210 Conn. 189, 192, 554 A.2d 287 (1989). Standing requires no more than a colorable claim of injury; a [party] ordinarily establishes . . . standing by *allegations* of injury. Similarly, standing exists to attempt to vindicate arguably protected interests. . . . *Gay & Lesbian Law Students Assn.* v. *Board of Trustees,* supra, 466." (Emphasis in original; internal quotation marks omitted.) *State* v. *DeCaro,* 252 Conn. 229, 253–54, 745 A.2d 800 (2000).

"Standing is established by showing that the party claiming it is authorized by statute to bring suit or is classically aggrieved. . . . The fundamental test for determining aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific, personal and legal interest in [the subject matter of the challenged action], as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the [challenged action]." (Citation omitted; internal quotation marks omitted.) *Steeneck* v. *University of Bridgeport,* supra, 235 Conn. 579. "Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected."

(Internal quotation marks omitted.) *Pomazi* v. *Conservation Commission*, 220 Conn. 476, 483, 600 A.2d 320 (1991). We conclude that the statutory framework governing municipal development projects under chapter 132 of the General Statutes and the trial court's factual findings of bad faith on the part of the defendants in their adoption and intended implementation of the project plan, in an attempt to prevent the development of affordable housing on the AvalonBay parcel, are sufficient to have conferred standing on the plaintiffs to challenge the project plan.

First, chapter 132 of the General Statutes; General Statutes §§ 8-186 through 8-200b; entitled "Municipal Development Projects," pursuant to which the project plan was adopted, provides the statutory framework for the municipal acquisition and improvement of real property for business and industrial purposes. As a general matter, the purpose of this statutory framework is to foster "the continued growth of industry and business within the state," by "permitting and assisting municipalities to acquire and improve" certain property in accordance with the requirements and purposes of chapter 132. General Statutes § 8-186.[12] To that end,

[12] General Statutes § 8-186 provides: "Declaration of policy. It is found and declared that the economic welfare of the state depends upon the continued growth of industry and business within the state; that the acquisition and improvement of unified land and water areas and vacated commercial plants to meet the needs of industry and business should be in accordance with local, regional and state planning objectives; that such acquisition and improvement often cannot be accomplished through the ordinary operations of private enterprise at competitive rates of progress and economies of cost; that permitting and assisting municipalities to acquire and improve unified land and water areas and to acquire and improve or demolish vacated commercial plants for industrial and business purposes and, in distressed municipalities, to lend funds to businesses and industries within a project area in accordance with such planning objectives are public uses and purposes for which public moneys may be expended; and that the necessity in the public interest for the provisions of this chapter is hereby declared as a matter of legislative determination."

General Statutes § 8-188[13] authorizes municipalities "to designate the economic development commission or the redevelopment agency of such municipality or a nonprofit development corporation as its development agency and exercise through such agency the powers granted under this chapter," which include the power of eminent domain granted pursuant to General Statutes § 8-193,[14] entitled "Acquisition and transfer of real property. General powers of agency." General Statutes § 8-

[13] General Statutes § 8-188 provides: "Designation of development agency. Any municipality which has a planning commission is authorized, by vote of its legislative body, to designate the economic development commission or the redevelopment agency of such municipality or a nonprofit development corporation as its development agency and exercise through such agency the powers granted under this chapter, except that the Quinnipiac Valley Development Corporation, organized and existing by virtue of the provisions of number 625 of the special acts of 1957, may be designated as a development agency, for the purposes of this chapter, to act as such within the geographical area specified in section 2 of said special act. Any municipality may, with the approval of the commissioner, designate a separate economic development commission, redevelopment agency or nonprofit development corporation as its development agency for each development project undertaken by the municipality pursuant to this chapter."

[14] General Statutes § 8-193 provides in relevant part: "Acquisition and transfer of real property. General powers of agency. (a) After approval of the development plan as provided in this chapter, the development agency may proceed by purchase, lease, exchange or gift with the acquisition or rental of real property within the project area and real property and interests therein for rights-of-way and other easements to and from the project area. The development agency may, with the approval of the legislative body, and in the name of the municipality, acquire by eminent domain real property located within the project area and real property and interests therein for rights-of-way and other easements to and from the project area, in the same manner that a redevelopment agency may acquire real property under sections 8-128 to 8-133, inclusive, as if said sections specifically applied to development agencies. The development agency may, with the approval of the legislative body and, of the commissioner if any grants were made by the state under section 8-190 or 8-195 for such development project, and in the name of such municipality, transfer by sale or lease at fair market value or fair rental value, as the case may be, the whole or any part of the real property in the project area to any person, in accordance with the project plan and such disposition plans as may have been determined by the commissioner. . . ."

189[15] permits a development agency to "initiate a development project by preparing a project plan . . . in accordance with regulations of the commissioner [of economic and community development]." General Statutes § 8-191[16] then provides that, once a project plan is

[15] General Statutes § 8-189 provides: "The development agency may initiate a development project by preparing a project plan therefor in accordance with regulations of the commissioner. The project plan shall include: (a) A legal description of the land within the project area; (b) a description of the present condition and uses of such land or building; (c) a description of the types and locations of land uses or building uses proposed for the project area; (d) a description of the types and locations of present and proposed streets, sidewalks and sanitary, utility and other facilities and the types and locations of other proposed site improvements; (e) statements of the present and proposed zoning classification and subdivision status of the project area and the areas adjacent to the project area; (f) a plan for relocating project-area occupants; (g) a financing plan; (h) an administrative plan; (i) a marketability and proposed land-use study or building use study if required by the commissioner; (j) appraisal reports and title searches; (k) a statement of the number of jobs which the development agency anticipates would be created by the project and the number and types of existing housing units in the municipality in which the project would be located, and in contiguous municipalities, which would be available to employees filling such jobs and (l) findings that the land and buildings within the project area will be used principally for industrial or business purposes; that the plan is in accordance with the plan of development for the municipality adopted by its planning commission and the plan of development of the regional planning agency, if any, for the region within which the municipality is located; that the plan is not inimical to any state-wide planning program objectives of the state or state agencies as coordinated by the Secretary of the Office of Policy and Management; that the project will contribute to the economic welfare of the municipality and the state; and that to carry out and administer the project, public action under this chapter is required. Any plan which has been prepared by a redevelopment agency under chapter 130 may be submitted by the development agency to the legislative body and to the commissioner in lieu of a plan initiated and prepared in accordance with this section, provided all other requirements of this chapter for obtaining the approval of the commissioner of the project plan are satisfied."

[16] General Statutes § 8-191 provides: "Adoption of plan. (a) Before the development agency adopts a plan for a development project, (1) the planning commission of the municipality shall find that the plan is in accord with the plan of development for the municipality; and (2) the regional planning agency, if any, for the region within which such municipality is located shall find that such plan is in accord with the plan of development for such region, or if such agency fails to make a finding concerning said

approved by the development agency, in accordance with certain criteria, it must be submitted to the appropriate legislative body,[17] which "shall vote to approve or disapprove the plan." Once the plan is approved, the development agency may proceed with the acquisition of the real property by purchase, lease, exchange, gift or eminent domain. See General Statutes § 8-193 (a).

This statutory framework contemplates and serves to effectuate the acquisition of real property, by eminent domain if necessary, in order to foster industrial and business development. In essence, under this framework, without the acquisition of the subject property the project plan would not accomplish its intended legal

plan within thirty-five days of receipt thereof by such agency, it shall be presumed that such agency does not disapprove of such plan; and (3) the development agency shall hold at least one public hearing thereon. Upon approval by the development agency, the agency shall submit such plan to the legislative body which shall vote to approve or disapprove the plan. After approval of the plan by the legislative body, the development agency shall submit the plan for approval to the commissioner. Notice of the time, place and subject of any public hearing held under this section shall be published once in a newspaper of general circulation in such town, such publication to be made not less than one week nor more than three weeks prior to the date set for the hearing. In the event the commissioner requires a substantial modification of the project plan before giving approval, then upon the completion of such modification such plan shall first have a public hearing and then be approved by the development agency and the legislative body. Any legislative body, agency or commission in approving a plan for a development project shall specifically approve the findings made therein.

"(b) The provisions of subsection (a) with respect to submission of a development project to and approval by the commissioner shall not apply to a project for which no grant has been made under section 8-190 and no application for a grant is to be made under section 8-195."

[17] General Statutes § 8-187 (2) provides: " '[L]egislative body' means (A) the board of selectmen in a town that does not have a charter, special act or home rule ordinance relating to its government or (B) the council, board of aldermen, representative town meeting, board of selectmen or other elected legislative body described in a charter, special act or home rule ordinance relating to government in a city, consolidated town and city, consolidated town and borough or a town having a charter, special act, consolidation ordinance or home rule ordinance relating to its government . . . ."

purpose. Indeed, it is only "[a]fter approval of the [project] plan as provided in [chapter 132]," that the development agency may proceed with the acquisition of real property within the project area. General Statutes § 8-193.

It bears emphasis that a project plan developed under chapter 132 is significantly different from a town plan of development, sometimes referred to as a master plan, adopted pursuant to General Statutes § 8-23.[18] This

[18] General Statutes § 8-23 provides: "(a) The commission shall prepare, adopt and amend a plan of conservation and development for the municipality. Such plan shall show the commission's recommendation for the most desirable use of land within the municipality for residential, recreational, commercial, industrial, conservation and other purposes and for the most desirable density of population in the several parts of the municipality. Such plan shall take into account the state plan of conservation and development adopted pursuant to chapter 297 and shall note any inconsistencies it may have with said state plan. Such plan shall make provision for the development of housing opportunities, including opportunities for multifamily dwellings, consistent with soil types, terrain and infrastructure capacity, for all residents of the municipality and the planning region in which the municipality is located, as designated by the Secretary of the Office of Policy and Management under section 16a-4a. Such plan shall also promote housing choice and economic diversity in housing, including housing for both low and moderate income households, and encourage the development of housing which will meet the housing needs identified in the housing plan prepared pursuant to section 8-37t and in the housing component and the other components of the state plan of conservation and development prepared pursuant to section 16a-26. Such plan may also show the commission's recommendation for a system of principal thoroughfares, parkways, bridges, streets and other public ways; for airports, parks, playgrounds and other public grounds; for general location, relocation and improvement of public buildings; for the general location and extent of public utilities and terminals, whether publicly or privately owned, for water, sewerage, light, power, transit and other purposes; and for the extent and location of public housing projects. Such other recommendations may be made by the commission and included in the plan as will, in its judgment, be beneficial to the municipality. The plan of conservation and development shall be a statement of policies, goals and standards for the physical and economic development of the municipality, and may include all necessary and related maps, explanatory material, photographs, charts or other pertinent data and information relative to the past, present and future trends of the municipality, and may include recommended programs for the implementation of the plan, including a schedule and budget for public capital projects, and a program

court repeatedly has recognized that "a town plan is

for enactment and enforcement of zoning and subdivision controls, building and housing codes and safety regulations, plans for implementation of affordable housing and plans for open space acquisition and greenways protection and development. In preparing such plan the commission shall consider the community development action plan of the municipality, if any, the need for affordable housing and the protection of existing and potential public surface and ground drinking water supplies, and may consider physical, social, economic and governmental conditions and trends, including, but not limited to, local, regional and state studies of the human resource, education, health, housing, recreation, social services, public utilities, public protection, transportation and circulation, cultural and interpersonal communications needs of the municipality and the objectives of energy-efficient patterns of development, the use of solar and other renewable forms of energy, and energy conservation. The plan shall be designed to promote with the greatest efficiency and economy the coordinated development of the municipality and the general welfare and prosperity of its people. The commission may prepare and adopt plans for the redevelopment and improvement of districts or neighborhoods which, in its judgment, contain special problems or show a trend toward lower land values. The plan adopted under this section for any municipality that is contiguous to Long Island Sound shall be made with reasonable consideration for restoration and protection of the ecosystem and habitat of Long Island Sound and shall be designed to reduce hypoxia, pathogens, toxic contaminants and floatable debris in Long Island Sound. The plan of any municipality in which a traprock ridge, as defined in section 8-1aa, is located may make recommendations for conservation and preservation of traprock ridgelines, as defined in said section. The commission may adopt the plan of conservation and development by a single resolution or may, by successive resolutions, adopt parts of the plan, whether geographical or functional, and amendments thereto. Prior to adopting the conservation and development plan or any part thereof or amendment thereto, the commission shall file in the office of the town clerk a copy of such plan or part thereof or amendment thereto but, in the case of a district commission, such commission shall file such information in the offices of both the district clerk and the town clerk, and shall hold at least one public hearing thereon, notice of the time and place of which shall be published in a newspaper having general circulation in the municipality at least twice at intervals of not less than two days, the first not more than fifteen days, nor less than ten days, and the last not less than two days prior to the date of each such hearing, which notice shall make reference to the filing of such records in the office of the town clerk, or both the district clerk and the town clerk, as the case may be. Any plan or part thereof or amendment thereto shall, upon adoption by the commission, be filed in the office of the town clerk, but, if it is a district plan or amendment, it shall be filed in the offices of both the district and town clerk, and shall become effective at a time established by the commission, provided notice

merely advisory. *Lathrop* v. *Planning & Zoning Commission*, 164 Conn. 215, 223, 319 A.2d 376 (1973); *Spada* v. *Planning & Zoning Commission*, 159 Conn. 192, 200, 268 A.2d 376 (1970); *Dooley* v. *Town Plan & Zoning Commission*, 154 Conn. 470, 473, 226 A.2d 509 (1967). The purpose of the [town] plan is to set forth the most desirable use of land and an overall plan for the town. . . . [S]ee *Mott's Realty Corporation* v. *Town Plan & Zoning Commission*, 152 Conn. 535, 538, 209 A.2d 179 (1965). *Purtill* v. *Town Plan & Zoning Commission*, 146 Conn. 570, 572, 153 A.2d 441 (1959)." (Citation omitted.) *Smith* v. *Zoning Board of Appeals*, 227 Conn. 71, 87–88, 629 A.2d 1089 (1993), cert. denied, 510 U.S. 1164, 114 S. Ct. 1190, 127 L. Ed. 2d 540 (1994). "The development plan is the planning commission's recommendation on the most desirable uses of all land within the community, including all public and private uses from street layouts to industrial sites." T. Tondro, Connecticut Land Use Regulation (2d Ed. 1992) pp. 203–204. "Because the overall objectives contained in the town plan must be implemented by the enactment of specific

thereof shall be published in a newspaper having general circulation in the municipality prior to such effective date.

"(b) The commission shall review the plan of conservation and development at least once every ten years and shall adopt such amendments to the plan or parts of the plan, in accordance with the provisions of this section, as the commission deems necessary to update the plan. On and after July 1, 2000, if a commission does not review the plan within said ten years, the chief elected official of the municipality shall submit a letter to the Secretary of the Office of Policy and Management and the Commissioners of Transportation and Economic and Community Development that explains why such review was not conducted. A copy of the letter shall be included in each application by the head of a municipal agency for funding for development of real property submitted to said secretary or commissioners until the plan is reviewed in accordance with this subsection.

"(c) The commission of any municipality more than twenty per cent of which is existing preservation area, conservation area or rural land, as defined in the state plan of conservation and development adopted pursuant to chapter 297, shall consider as part of its plan of conservation and development the use of cluster development to the extent consistent with soil types, terrain and infrastructure capacity within the municipality."

regulations, the plan itself can operate only as an interpretive tool. See, e.g., *Raybestos-Manhattan, Inc.* v. *Planning & Zoning Commission*, 186 Conn. 466, 475, 442 A.2d 65 (1982)." *Smith* v. *Zoning Board of Appeals*, supra, 88.

Those characteristics of a town plan, however, do not accompany a project plan adopted under chapter 132. The distinction between the two types of development plans illuminates one of the significant, if not the primary, legal functions that a project plan is designed to serve, namely, to effectuate the municipal acquisition of real property.

Second, the trial court found that the project plan was "but a pretext in trying to thwart affordable housing on the [AvalonBay parcel]." The court found that, in light of the plaintiffs' sustained appeals from the denials by the town plan and zoning commission and the inland wetlands and watercourses commission, it was likely that the plaintiffs' affordable housing application, which met the town's zoning standards, would proceed unless the town condemned the parcel. The court also found that, although the town "claim[ed] that the vacant land surrounding the site has always been designated for industrial use, the present condition of the land sought for the industrial park is a mixture of parcels and uses." The court also found that the zone that includes the proposed industrial park, until recently allowed planned residential developments. Because of that zoning scheme, one parcel adjoining the site is currently used as a seniors apartment complex and another parcel nearby was approved as a housing development.

The court reasoned that "the timing of the project plan, as well as the sparsity of detail in the plan itself," supported a finding of pretext. Specifically, the trial court found that "the ideas for an industrial park first [began] to take shape only after the affordable housing

application was submitted some weeks prior to the issuance of a moratorium on planned residential developments. The moratorium would have precluded AvalonBay's application had it been filed subsequently. Furthermore, the actual project plan was being developed only after AvalonBay's proposal to build affordable housing. Interestingly, the project plan was not yet complete at the time that [the town] initiated eminent domain proceedings, for the second time, against the site."

The court further found that "the overwhelming evidence suggests that the project plan exhibited but the bare minimum amount of information and planning as to any future industrial park." The project plan was "deficient in numerous areas ranging throughout the plan," " 'evasive and vague,' " and was, at best, "incomplete." Moreover, "[w]hile the plan discusses the site, it is virtually silent as to the rest of the acreage that is to comprise the industrial park. Thus, while the project plan discusses the bare minimum as to the proposed site for affordable housing, it does not even do so for the rest of the project."

Although the haste and sparsity of the plan weighed heavily in the court's finding of pretext, the court also relied on the actions and statements of the board of selectmen and other town officials, as "more indicative of the general attitude and motives . . . in regards to AvalonBay's affordable housing application." In this connection, the court specifically relied on statements made by Sousa in which he described the town's eminent domain power with respect to the accompanying industrial park as a way to regain control of property that some statutes, such as the affordable housing statute, allegedly take away from municipalities. The trial court found that town officials "strategized against AvalonBay by attempting to downplay affordable housing by focusing on the high costs with which the town

would be burdened if the application proceeded. . . . [M]any of the representations made by [the town] were gross exaggerations and misleading." These misrepresentations concerned the number of schoolchildren who would live in the housing, the possibility that a new school would have to be built at a substantial cost to taxpayers, higher crime risks, increased municipal costs and the alleged inability of the fire department to combat fires at the site.

In sum, the statutory framework undergirding the project plan, which anticipates and is a necessary component in effectuating a taking by eminent domain, coupled with the trial court's factual findings of bad faith, are sufficient to have established the plaintiffs' standing. The plaintiffs' ownership of the AvalonBay parcel, and AvalonBay's plan to develop affordable housing on it, and the court's findings of bad faith by the defendants aimed at the plaintiffs' development, gave the plaintiffs a specific, personal and legal interest in the project plan, which would have thwarted that development, and are sufficient to establish that the plaintiffs' legal interest was specially and injuriously affected by the project plan.

The defendants argue that the project plan is a mere planning document, and that the plaintiffs have neither alleged nor proven that its adoption threatens or inflicts a direct injury upon them. As we stated previously, however, without the intended acquisition of the parcel the project plan would not serve its intended legal function. Approval of the project plan is the necessary predicate to the acquisition of property for chapter 132 purposes. That statutory scheme, coupled with findings of bad faith, satisfy classic aggrievement principles.

The defendants also argue that "it is inconsistent with the statutory schemes involved to permit a private right of action with respect to the adoption of municipal

development plans. . . . Nothing in the statutory framework suggests that private parties should be given a right of action to challenge the adoption or contents of the plan per se . . . ." We agree that a private right of action does not exist per se to challenge the adoption of a project plan. We think, however, that in this case the specific findings of bad faith, aimed at the plaintiffs, in the formulation of a project plan under chapter 132, were sufficient to afford the plaintiffs standing to challenge the project plan.

The defendants further contend that the record does not support the trial court's finding that the industrial park was merely a pretext in an effort to thwart affordable housing. We disagree.

First, the record fully supports the trial court's finding that the project plan was hastily assembled, poorly envisioned and incomplete. There was ample evidence that the defendants developed the idea for an industrial park and began the process to create the project plan only after AvalonBay had filed its application for affordable housing, and only weeks before the issuance of a moratorium on planned residential developments. Indeed, even when the town initiated eminent domain proceedings against the parcel, the project plan was not complete.

The plaintiffs offered the testimony of five expert witnesses, each of whom criticized the project plan. Those expert witnesses testified that the project plan was missing information, contained inaccurate information and did not meet the minimum standards of their professions. For example, David Schiff, a planning and development consultant, testified that the project plan's program overview was "unclear," "contradictory in certain places" and "internally inconsistent." The project plan referred to the pressures of a changing economy, but did not support that statement with any discussion

or description thereof. The project plan claimed that there was an increased demand for industrial research lands, but nowhere in the project plan was there any evidence of an increased demand for high-tech industrial development, and "certainly not in Orange." Reference was made to the need to increase the grand list, yet Schiff's analysis demonstrated that the proposed AvalonBay housing development would generate substantially more taxes to the town than would an industrial development on the AvalonBay parcel. The project plan's program overview claimed that there was an underutilization of existing industrial facilities and space, as well as a demand for such facilities, yet, in Schiff's opinion, vacancies and deterioration of existing industrial facilities do not reflect an increased demand for such use.

Schiff also testified that the project plan, contrary to its claims, neither provided a guide for planning and development decisions, nor included objectives for physical, social, economic and aesthetic development. Furthermore, according to Schiff, the description of the project boundaries was confusing. Schiff testified that he could not perceive a rationale for starting the development of an industrial park at the location of the AvalonBay parcel. Schiff also identified other unsubstantiated, unexplained claims made in the project plan, including that: (1) eminent domain was necessary; (2) various, but as yet unidentified, parcels needed upgrading; and (3) it was necessary to divide parcels in order to accommodate private development requests, despite no indication that private development was seeking smaller parcels. Moreover, Schiff pointed out the following omissions from the project plan: (1) there was no discussion of proposed uses or actions necessary concerning any parcels in the project area other than the AvalonBay parcel; (2) there was no provision for funding any improvements; (3) there was no analysis

as to why 10,000 to 40,000 square foot users constituted the highest and best use; and (4) there was no discussion of the creation of nonconforming uses for existing property owners.

Furthermore, although the state department of economic and community development (department) found that the project plan did not conflict with its objectives, it criticized the project plan as being internally inconsistent and weak in several areas. A letter to the economic development commission from Chet Camarata, the executive director of the department, incorporated the detailed comments by Michael Santoro, a community development specialist. Santoro's March 2, 1999 memorandum stated that the plan was "inconsistent in a number of sections as well as vague and evasive in others." Santoro found that the scope of the project, relocation plan and financing plan were unclear. For example, Santoro recognized that the project plan identified eighteen parcels to be included in the project area, but only provided details with respect to two parcels, namely, those parcels involving the plaintiffs. Santoro also recognized that twelve of the parcels in the project area were currently occupied by business or individuals, yet the project plan did not indicate that any relocation was necessary.

B

The defendants next contend that the plaintiffs are not entitled to injunctive relief with respect to the project plan. The substance of this claim can be distilled into three distinct subparts: (1) the plaintiffs failed to demonstrate the imminent threat of irreparable harm arising from the adoption or the implementation of the industrial park plan; (2) "[t]here was no evidence from which the trial court could properly have concluded that the town's actions were motivated by a desire to exclude affordable housing"; and (3) the trial court had

no factual or legal basis for enjoining the project plan. We disagree.

We conclude that when a trial court makes findings of bad faith on the part of a municipality in the context of a project plan developed and adopted pursuant to chapter 132, aimed at a proposed development of property that would be thwarted by the project plan, such findings provide a sufficient legal basis for granting an injunction against the implementation of the project plan. As discussed more thoroughly in part I A of this opinion, chapter 132 of the General Statutes provides for the municipal acquisition of property in order to foster the continued growth of industry and business. Because there is no statutory right to appeal from the adoption of a project plan under chapter 132 of the General Statutes, there is no adequate remedy at law. See *Stocker* v. *Waterbury*, 154 Conn. 446, 449, 226 A.2d 514 (1967). In such a statutory context, where the trial court has made factual findings of bad faith on the part of the defendants, the granting of an injunction may be proper.

In the present case, the trial court found that, in connection with the development, adoption and intended implementation of the project plan, the town had acted in bad faith in an attempt to prevent affordable housing. Because we have set forth the extensive factual findings of the trial court and the ample evidence in the record to support those findings; see part I A of this opinion; it is unnecessary to recount that discussion here. We conclude, therefore, that the trial court was well within its discretion in enjoining the town from implementing the project plan.

The defendants argue that "it is essentially undisputed that the park plan was properly devised and adopted in strict conformity with the governing state statutes," and, as such, the trial court did not have

any legal basis for enjoining the project plan. We are not persuaded.

First, it can hardly be said that there was general agreement that the project plan was developed and adopted in accordance with the relevant statutory provisions. The issue of the adequacy of the project plan was disputed throughout the litigation and was thoroughly contested at trial. The trial court expressly found: "While the evidence offered by the defendants' expert planner shows that the project plan met the essential attributes of a basic development plan, the overwhelming evidence suggests that the project plan exhibited but the bare minimum amount of information and planning as to any future industrial park." As discussed previously, there was ample evidence to support such a finding.

Second, even if we were to assume that the project plan and its adoption conformed to the substantive and procedural requirements of chapter 132 of the General Statutes, our conclusion in part I A and B of this opinion would remain unchanged. Stated briefly, a project plan—even one that conforms to the requirements of chapter 132—may be enjoined if it was adopted, not for the purposes contemplated by chapter 132, but in bad faith and in furtherance of a plainly improper motive, namely, as a pretext to thwart what would otherwise be a legitimate use of the property.

The defendants argue that the trial court improperly imposed its alleged policy preference, namely, its preference for affordable housing, upon the town. The defendants rely on the following excerpt from the trial court's memorandum of decision: "The town . . . has a void to fill when it comes to meeting the public need for affordable housing. To uphold [the town's] condemnation of land specifically devoted to that purpose would, *in light of the evidence discussed above,* be

improper." (Emphasis added.) We do not, however, read the trial court's statements, which the defendants challenge herein, as a refusal, *apart from its findings of pretext*, to permit the taking of the AvalonBay parcel by eminent domain merely because it was to be devoted to the use of affordable housing.

## II

The defendants next claim that the trial court improperly granted an injunction that enjoined them from taking the AvalonBay parcel by eminent domain. The defendants argue that there was no colorable threat of imminent or irreparable injury to the plaintiffs to support such an injunction. The defendants also argue that, by the time that the court issued the injunction, the second count of the plaintiffs' amended complaint had been rendered moot as a result of the resolutions adopted by the board of selectmen and the economic development commission to abandon the effort to take the parcel by eminent domain. The defendants further argue, *among other arguments addressed more appropriately in part I of this opinion*, that even if it were proper for the trial court to rule on count two, the relief it granted was overbroad. We agree with the defendants in part, and conclude that the issue of the taking had been rendered moot. We base our conclusion on two independent factors: (1) the fact that the challenged, intended condemnation of the AvalonBay parcel was wholly dependent on the project plan, the injunction against which we have affirmed in part I of this opinion; and (2) the fact that the vote approving the condemnation of the parcel, which was taken at a town meeting on March 29, 1999, expired by operation of law on September 29, 1999, before the trial court issued the injunction.

"[M]ootness implicates the jurisdiction of the court. *Goodson* v. *State*, 228 Conn. 106, 114, 635 A.2d 285

(1993). It is a well-settled general rule that the existence of an actual controversy is an essential requisite to appellate jurisdiction; it is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow. . . . In the absence of an actual and existing controversy for us to adjudicate . . . the courts of this state may not be used as a vehicle to obtain judicial opinions upon points of law . . . and where the question presented is purely academic, we must refuse to entertain the appeal. . . . *Delevieleuse* v. *Manson*, 184 Conn. 434, 436, 439 A.2d 1055 (1981). When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot. . . . *Loisel* v. *Rowe*, 233 Conn. 370, 378, 660 A.2d 323 (1995)." (Internal quotation marks omitted.) *Green Rock Ridge, Inc.* v. *Kobernat*, 250 Conn. 488, 497, 736 A.2d 851 (1999).

First, the controversy in the present case arises out of the intended implementation of the project plan. The intended condemnation of the AvalonBay parcel—the subject of the second count of the amended complaint—is wholly dependent on the project plan. Under the statutory framework of chapter 132 described previously, the challenged, intended condemnation loses its viability in the absence of a valid project plan. We therefore conclude that the injunction of the project plan, which we affirmed in part I of this opinion, renders the intended condemnation of the parcel moot.

Second, approval of the condemnation of the parcel, which was granted pursuant to General Statutes § 48-6[19] at a town meeting on March 29, 1999, by the voters

---

[19] General Statutes § 48-6 provides: "When municipal corporations may take land. (a) Any municipal corporation having the right to purchase real property for its municipal purposes which has, in accordance with its charter or the general statutes, voted to purchase the same shall have power to take or acquire such real property, within the corporate limits of such municipal corporation, and if such municipal corporation cannot agree with

of the town, expired on September 29, 1999, by operation of law, namely, § 48-6 (a). Section 48-6 (a) provides: "Any municipal corporation having the right to purchase real property for its municipal purposes which has, in accordance with its charter or the general statutes, voted to purchase the same shall have power to take or acquire such real property, within the corporate limits of such municipal corporation, and if such municipal corporation cannot agree with any owner upon the amount to be paid for any real property thus taken, *it shall proceed in the manner provided by section 48-12 within six months after such vote or such vote shall be void.*" (Emphasis added.) We therefore turn to General Statutes § 48-12,[20] which provides in relevant part: "The procedure for condemning land . . . for any of the purposes specified in [section] . . . 48-6 . . . if those desiring to take such property cannot agree with the owner upon the amount to be paid him for any property thus taken, shall be as follows . . . any town

any owner upon the amount to be paid for any real property thus taken, it shall proceed in the manner provided by section 48-12 within six months after such vote or such vote shall be void.

"(b) In the case of acquisition by a redevelopment agency of real property located in a redevelopment area, the time for acquisition may be extended by the legislative body upon request of the redevelopment agency, provided the owner of the real property consents to such request.

"(c) In accordance with the policy established in section 7-603, any municipal corporation may take property which is located within the boundaries of a neighborhood revitalization zone identified in a strategic plan adopted pursuant to sections 7-601 and 7-602. The acquisition of such property shall proceed in the manner provided in sections 8-128 to 8-133, inclusive, and section 48-12."

[20] General Statutes § 48-12 provides: "Procedure for condemning land. The procedure for condemning land or other property for any of the purposes specified in sections 48-3, 48-6, 48-8 and 48-9, if those desiring to take such property cannot agree with the owner upon the amount to be paid him for any property thus taken, shall be as follows: The Comptroller in the name of the state, any town, municipal corporation or school district, or the trustees or directors of any state institution in the name of the state, shall proceed in the same manner specified for redevelopment agencies in accordance with sections 8-128, 8-129, 8-129a, 8-130, 8-131, 8-132, 8-132a and 8-133."

. . . shall proceed in the same manner specified for redevelopment agencies in accordance with sections 8-128, 8-129, 8-129a, 8-130, 8-131, 8-132, 8-132a and 8-133." The procedures required by those enumerated sections include: determining the compensation to be paid to the condemnee and filing a statement of compensation with the clerk of the Superior Court; General Statutes § 8-129; filing a deposit as provided in General Statutes § 8-130 with the clerk of the Superior Court; General Statutes § 8-129; giving notice to all persons appearing of record as a property owner affected by the condemnation or as a holder of any encumbrance on such property or interest therein; General Statutes § 8-129; and causing a certificate of taking to be recorded in the office of the town clerk. General Statutes § 8-129. There is nothing in the record to suggest that the town proceeded *in any manner* in accordance with the requisite procedures set forth in § 48-12, and, derivatively, General Statutes §§ 8-128, 8-129, 8-129a, 8-130, 8-131, 8-132, 8-132a and 8-133. Consequently, the requisite vote authorizing the condemnation of the AvalonBay parcel expired by operation of law, namely, § 48-6 (a), six months after the vote was taken, or on September 29, 1999, approximately five months before the trial court enjoined the eminent domain in February, 2000.

The plaintiffs argue that the issue of eminent domain is not moot because the history of events and the political environment in the town create a reasonable expectation that the condemnation will be reinstated. In light of the fact that we have affirmed the findings of the trial court with respect to the defendants' bad faith in proceeding with its plans to take the AvalonBay parcel and develop an industrial park; see part I of this opinion; we believe that it is unlikely that the defendants would attempt to reinstitute their efforts to condemn the parcel. Furthermore, the injunction against the project plan

would still be in effect, rendering any such attempt legally futile.

The plaintiffs further argue that the defendants' authorization to acquire the AvalonBay parcel had not expired by operation of the six month period pursuant to § 48-6 (a). The plaintiffs contend that "for projects such as this one," § 8-128 provides that the implementing agency is to proceed "[w]ithin a reasonable time after its approval of the redevelopment plan"; General Statutes § 8-128; and that, therefore, "[t]he defendants were not required to complete acquisition within six months." This argument is unavailing.

First, the plaintiffs' construction of those provisions would render the six month period imposed by § 48-6 (a) meaningless, because the more general time limitation contained in § 8-128—one of the referents in § 48-12, which itself is a referent in § 48-6 (a)—would subsume the more specific time period set forth in § 48-6 (a). Second, although § 8-193 provides that the development agency may acquire real property by eminent domain "in the same manner that a redevelopment agency may acquire real property under sections 8-128 to 8-133, inclusive, as if said sections specifically applied to development agencies," we do not read the reasonableness time standard in the first clause of § 8-128, which is expressly applicable to redevelopment plans, to trump the specific time period set forth in § 48-6 (a). See *Willoughby* v. *New Haven*, 254 Conn. 404, 422, 757 A.2d 1083 (2000) (refusing to construe general statutory phrase in manner that would subsume and render meaningless more specific phrase). Moreover, our treatment of the six month time requirement in § 48-6 (a) does not result in redundant language and gives meaning to every clause of the applicable statutes. "It is a basic tenet of statutory construction that the legislature did not intend to enact meaningless provisions. *Turner* v. *Turner*, 219 Conn. 703, 713, 595 A.2d 297 (1991). Accord-

ingly, care must be taken to effectuate all provisions of the statute. See *Pintavalle* v. *Valkanos*, 216 Conn. 412, 418, 581 A.2d 1050 (1990) ([a] statute should be read as a whole and interpreted so as to give effect to all of its provisions); *Hopkins* v. *Pac*, 180 Conn. 474, 476, 429 A.2d 952 (1980) (it is a well established principle that statutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant)." (Internal quotation marks omitted.) *Willoughby* v. *New Haven*, supra, 422.

## III

We next consider the claim raised in AvalonBay's cross appeal. AvalonBay claims that the trial court improperly found on count three that the defendants had not violated federal and state fair housing laws that prohibit making a dwelling unavailable because of familial status.[21] See 42 U.S.C. § 3604 (a);[22] General

---

[21] Title 42 of the United States Code, § 3602 (k), provides: " 'Familial status' means one or more individuals (who have not attained the age of 18 years) being domiciled with—

"(1) a parent or another person having legal custody of such individual or individuals; or

"(2) the designee of such parent or other person having such custody, with the written permission of such parent or other person.

"The protections afforded against discrimination on the basis of familial status shall apply to any person who is pregnant or is in the process of securing legal custody of any individual who has not attained the age of 18 years."

General Statutes § 46a-64b (5) defines " '[f]amilial status' " as "one or more individuals who have not attained the age of eighteen years being domiciled with a parent or another person having legal custody of such individual or individuals; or the designee of such parent or other person having such custody with the written permission of such parent or other person; or any person who is pregnant or is in the process of securing legal custody of any individual who has not attained the age of eighteen years."

[22] Title 42 of the United States Code, § 3604, provides in relevant part: "As made applicable by section 3603 of this title and except as exempted by sections 3603 (b) and 3607 of this title, it shall be unlawful—

"(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin. . . ."

Statutes § 46a-64c (a) (1).[23] The trial court found that the defendants opposed affordable housing in general terms, but did not discriminate on the basis of families with children. Thus, the trial court found that, although the defendants sought to thwart the development of affordable housing on the AvalonBay parcel, AvalonBay failed to establish the basis of a fair housing violation, namely, that the presence of families with children was a motivating factor underlying the defendants' actions.

Specifically, AvalonBay and the amici curiae, which are the Connecticut Civil Liberties Union Foundation, the Connecticut Housing Coalition and the Connecticut Fair Housing Center, argue that, in applying the disparate treatment theory, specifically, the *McDonnell Douglas* model,[24] on which the plaintiffs relied, the trial court improperly concluded that AvalonBay had failed to establish a fair housing violation because it did not offer the evidence of open hostility, specifically, that which was offered in *LeBlanc-Sternberg* v. *Fletcher*, 67 F.3d 412 (2d Cir. 1995), cert. denied sub nom. *Airmont* v. *LeBlanc-Sternberg*, 518 U.S. 1017, 116 S. Ct. 2546, 135 L. Ed. 2d 1067 (1996).[25] AvalonBay also argues that the defendants did not identify any legitimate, nondiscriminatory reason for their actions that was not pretextual. The defendants' arguments, to the contrary,

[23] General Statutes § 46a-64c provides in relevant part: "(a) It shall be a discriminatory practice in violation of this section:

"(1) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, creed, color, national origin, ancestry, sex, marital status, age, lawful source of income or familial status. . . ."

[24] The *McDonnell Douglas* test for reviewing housing discrimination claims brought under a disparate treatment theory was set forth in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

[25] We note that AvalonBay does not claim that the trial court improperly found that there was no disparate impact on families with children as a result of the defendants' actions.

can be distilled as follows: (1) the trial court properly applied the "pretext"/*McDonnell Douglas* framework and properly concluded that AvalonBay had not proven a violation of the fair housing laws; (2) AvalonBay had not proven an intent to discriminate by the municipal decision-makers, which is necessary to establish municipal liability; and (3) in the alternative, even if the case were subjected to a "mixed-motive"/*Price Waterhouse* analysis,[26] the defendants would still prevail. AvalonBay counters that the defendants' second argument is not entitled to appellate review. We agree with the defendants' first argument and, therefore, we need not address the reviewability or the merits of their second and third arguments.

In order to address this claim, we first note that, in addressing claims brought under both federal and state housing laws, "we are guided by the cases interpreting federal fair housing laws; 42 U.S.C. §§ 3601 through 3631; despite differences between the state and federal statutes. *Zlokower* v. *Commission on Human Rights & Opportunities*, 200 Conn. 261, 264, 510 A.2d 985 (1986). In construing federal fair housing laws, the federal courts have adopted the evidentiary requirements set forth by the United States Supreme Court in federal employment discrimination cases. Id., 265. Therefore, we may look to these employment discrimination cases for the appropriate standard applicable to [AvalonBay's] claim." *Miko* v. *Commission on Human Rights & Opportunities*, 220 Conn. 192, 202, 596 A.2d 396 (1991); see also *Chestnut Realty, Inc.* v. *Commission on Human Rights & Opportunities*, 201 Conn. 350, 358, 514 A.2d 749 (1986).

The Fair Housing Act makes it unlawful "[t]o refuse to sell or rent . . . or *otherwise make unavailable* or

---

[26] The *Price Waterhouse* analysis of a claim involving housing discrimination was first applied by the United States Supreme Court in *Price Waterhouse* v. *Hopkins*, 490 U.S. 228, 246, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989).

deny, a dwelling to any person because of . . . familial status . . . ." (Emphasis added.) 42 U.S.C. § 3604 (a). "The phrase 'otherwise make unavailable' has been interpreted to reach a wide variety of discriminatory housing practices, including discriminatory zoning restrictions. See, e.g. *Huntington Branch, National Association For the Advancement of Colored People* v. *Town of Huntington*, 844 F.2d 926, 938 (2d Cir.), aff'd, 488 U.S. 15, 109 S. Ct. 276, 102 L. Ed. 2d 180 (1988) (per curiam); *Casa Marie, Inc.* v. *Superior Court of Puerto Rico*, 988 F.2d 252, 257 n.6 (1st Cir. 1993).

"The [Fair Housing Act] confers standing to challenge such discriminatory practices on any 'aggrieved person,' 42 U.S.C. § 3613 (a) (1) (A). That term is defined to include 'any person who—(1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur.' 42 U.S.C. § 3602 (i). This definition requires only that a private plaintiff allege 'injury in fact' within the meaning of Article III of the Constitution, that is, that he allege 'distinct and palpable injuries that are "fairly traceable" to [the defendants'] actions.' *Havens Realty Corp.* v. *Coleman*, 455 U.S. 363, 375–76, 102 S. Ct. 1114, 1122–23, 71 L. Ed. 2d 214 (1982). An injury need not be economic or tangible in order to confer standing. See, e.g., id. [376] (deprivation of social benefits of living in an integrated neighborhood constitutes cognizable injury); *Gladstone, Realtors* v. *Village of Bellwood*, 441 U.S. 91, 111–12, 99 S. Ct. 1601, 1613–14, 60 L. Ed. 2d 66 (1979) (same). See also H.R. Rep. No. 711, 100th Cong. 2d Sess. 23, reprinted in 1988 U.S. Code Cong. & Admin. News 2173, 2184 (current statutory definition of 'aggrieved person' was meant 'to reaffirm the broad holdings' of *Havens Realty Corp.* v. *Coleman*, [supra, 375–76] and *Gladstone, Realtors* v. *Village of Bellwood*, [supra, 111–12]).

"Further, the explicit grant of standing to anyone who believes he '*will* be injured by a discriminatory housing practice *that is about to occur*,' 42 U.S.C. § 3602 (i) . . . means that a person who is likely to suffer such an injury need not wait until a discriminatory effect has been felt before bringing suit. Thus, where it has been established that a zoning ordinance will likely be applied in a discriminatory manner, it is unnecessary that the municipality actually so apply it before the ordinance may properly be challenged. . . .

"[A Fair Housing Act] violation may be established on a theory of disparate impact or one of disparate treatment. See *Huntington Branch, National Association For the Advancement of Colored People* v. *Town of Huntington,* [supra, 844 F.2d 934–35]." (Citations omitted; emphasis in original.) *LeBlanc-Sternberg* v. *Fletcher,* supra, 67 F.3d 424–25. "Under the analysis of the disparate treatment theory of liability, there are two general methods to allocate the burdens of proof: (1) the mixed-motive/*Price Waterhouse* model; *Price Waterhouse* v. *Hopkins,* 490 U.S. 228, 246, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989); and (2) the pretext/ *McDonnell Douglas-Burdine* model. *Texas Dept. of Community Affairs* v. *Burdine,* 450 U.S. 248, 252–56, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); *McDonnell Douglas Corp.* v. *Green,* 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)." *Levy* v. *Commission on Human Rights & Opportunities,* 236 Conn. 96, 104–105, 671 A.2d 349 (1996).

Under the *McDonnell Douglas* model, in a classic refusal to rent case,[27] "the plaintiff claiming discrimina-

---

[27] Federal courts have applied the *McDonnell Douglas* model to federal housing discrimination claims. See, e.g., *Orange Lake Associates, Inc.* v. *Kirkpatrick,* 21 F.3d 1214, 1277 (2d Cir. 1994); *Soules* v. *United States Dept. of Housing & Urban Development,* 967 F.2d 817, 821 (2d Cir. 1992); *Huntington Branch, National Assn. for the Advancement of Colored People* v. *Huntington,* supra, 844 F.2d 934. Similarly, this court has applied the prima facie case established in *McDonnell Douglas* to housing discrimination claims brought under General Statutes § 46a-64a. See *Miko* v. *Commission*

tion . . . must prove that: (1) she is a member of the statutorily protected class; (2) she has applied for and was qualified to rent the unit involved; (3) she was rejected by the defendant landlord; and (4) the unit remained available thereafter. *Zlokower* v. *Commission on Human Rights & Opportunities*, supra, [200 Conn.] 266. The plaintiff has the initial burden of offering evidence on the above elements adequate to create an inference that the refusal to rent was based on a discriminatory criterion. *Chestnut Realty, Inc.* v. *Commission on Human Rights & Opportunities*, supra, [201 Conn.] 361." *Miko* v. *Commission on Human Rights & Opportunities*, supra, 220 Conn. 203–204. "By making out this minimal prima facie case, even without evidence of discrimination, the plaintiff creates a presumption that the employer unlawfully discriminated, *Fisher* [v. *Vassar College*, 114 F.3d 1332, 1335 (2d Cir. 1997), cert. denied, 522 U.S. 1075, 118 S. Ct. 851, 139 L. Ed. 2d 752 (1998)] . . . and thus places the burden of production on the employer to proffer a nondiscriminatory reason for its action. If the defendant fails to discharge the burden by presenting a nondiscriminatory reason, the plaintiff will prevail (assuming the other aspects of the prima facie case are not contested). Thus, aided by the *McDonnell Douglas* presumption, which is designed to force employers to come forward with reasons, a plaintiff who proves the minimal prima facie case is entitled to prevail as a matter of law even without evidence that would support a reasonable finding of discriminatory motivation, if the employer does not come forward with a reason. See *St. Mary's* [*Honor Center* v. *Hicks*, 509 U.S. 502, 506–10, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)]; [*Texas Dept. of Community Affairs* v.] *Bur-*

on Human Rights & Opportunities, supra, 220 Conn. 192; *Chestnut Realty, Inc.* v. *Commission on Human Rights & Opportunities*, supra, 201 Conn. 350; *Zlokower* v. *Commission on Human Rights & Opportunities*, supra, 200 Conn. 261.

*dine*, [supra, 450 U.S. 254]; *Fisher* [v. *Vassar College*, supra, 1335].

"On the other hand, once the employer articulates a non-discriminatory reason for its actions . . . the presumption completely drops out of the picture." (Citation omitted; internal quotation marks omitted.) *James v. New York Racing Assn.*, 233 F.3d 149, 154 (2d Cir. 2000); *Saulpaugh* v. *Monroe Community Hospital*, 4 F.3d 134, 142 (2d Cir. 1993), cert. denied, 510 U.S. 1164, 114 S. Ct. 1189, 127 L. Ed. 2d 539 (1994). "If the defendant articulates a legitimate, nondiscriminatory reason for its action, then the burden shifts back to the plaintiff to prove that the given reason was pretextual. [*Chestnut Realty, Inc.* v. *Commission on Human Rights & Opportunities*, supra, 201 Conn.] 364. The disparate treatment standard thus leaves the burden of persuasion at all times with the plaintiff. Id., 363.

"The United States Supreme Court recognized that the prima facie case set forth in *McDonnell Douglas Corporation* was not intended to be an 'inflexible formulation.' See *Chestnut Realty, Inc.* v. *Commission on Human Rights & Opportunities*, supra, [201 Conn.] 361, quoting *International Brotherhood of Teamsters* v. *United States*, [431 U.S. 324, 358, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977)]. Rather, the requirements of proof must be tailored to the particular facts of each case. *McDonnell Douglas Corporation* v. *Green*, supra, [411 U.S. 802 n.13]." *Miko* v. *Commission on Human Rights & Opportunities*, supra, 220 Conn. 204.

Thus, in *LeBlanc-Sternberg* v. *Fletcher*, supra, 67 F.3d 425–26, the United States Court of Appeals for the Second Circuit stated that, under the disparate treatment theory, "a plaintiff can establish a prima facie case by showing that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the

decision-makers were knowingly responsive. *United States* v. *Yonkers Board of Education*, 837 F.2d 1181, 1217, 1223, 1226 (2d Cir. 1987) . . . cert. denied, 486 U.S. 1055, 108 S. Ct. 2821, 100 L. Ed. 2d 922 (1988). If the motive is discriminatory, it is of no moment that the complained-of conduct would be permissible if taken for nondiscriminatory reasons. See, e.g., id. at 1218–19 . . . *United States* v. *City of Parma*, 661 F.2d 562, 574–75 (6th Cir. 1981) . . . cert. denied, 456 U.S. 926, 102 S. Ct. 1972, 72 L. Ed. 2d 441 (1982).

"Discriminatory intent may be inferred from the totality of the circumstances, including the fact, if it is true, that the law bears more heavily on one [group] than another, *Washington* v. *Davis*, 426 U.S. 229, 242, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976), as well as the historical background of the decision . . . [t]he specific sequence of events leading up to the challenged decision . . . contemporary statements by members of the decisionmaking body . . . and [s]ubstantive departures . . . particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached, [*United States* v. *Yonkers Board of Education*, supra, 837 F.2d] 1221 (quoting *Village of Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U.S. 252, 267–68, 97 S. Ct. 555, 564–65, 50 L. Ed. 2d 450 (1977)); see also *United States* v. *City of Black Jack*, 508 F.2d 1179, 1185 n.3 (8th Cir. 1974) (racist statements by leaders of the incorporation movement and fact that [r]acial criticism . . . was made and cheered at public meetings could be considered evidence of improper purpose), cert. denied, 422 U.S. 1042, 95 S. Ct. 2656, 45 L. Ed. 2d 694 (1975)." (Internal quotation marks omitted.)

In *LeBlanc-Sternberg* v. *Fletcher*, supra, 67 F.3d 417–20, the village of Airmont, New York, had adopted a zoning code that arguably prohibited the use of home synagogues, which were necessary for the strict obser-

vance of Orthodox Judaism. The Court of Appeals concluded that "there was ample support for the jury's implicit finding that Airmont's zoning code would be interpreted to restrict the use of home synagogues, [and] that the motivation behind the enactment was discriminatory animus toward Orthodox and Hasidic Jews . . . ." Id., 431. The evidence of the village's animosity toward the Hasidic population included selective zoning that would curtail home synagogues, refusal to grant a variance to a Hasidic party where a similar variance was granted to a party who was not Hasidic, and open hostility to the Hasidic Jewish population. Id.

In the present case, the trial court analyzed the case under the framework established in *McDonnell Douglas Corp.* v. *Green,* supra, 411 U.S. 792.[28] We need not consider whether the trial court applied the proper legal standard in determining whether AvalonBay made out a prima facie case. Even if we were to agree with AvalonBay that it sufficiently established a prima facie case of discrimination, we would then analyze the second step in the *McDonnell Douglas* model, namely, whether the defendants articulated a legitimate, nondiscriminatory reason for its action. AvalonBay concedes in its brief that "[t]he defendants' assertion of a technology park as their reason for condemnation on its face is ostensibly legitimate." As stated previously, once a defendant has *articulated,* not proven, a legitimate, nondiscriminatory reason for its actions, the presumption of discrimination invoked by the prima facie case drops out of the case entirely. The burden of production then shifts back to the plaintiff, who at all times has the burden of persuasion, to prove that the stated reason was pretextual.

In this regard, the trial court found that, although the plaintiffs presented evidence that included various

---

[28] The defendants and AvalonBay agree that the *McDonnell Douglas* model was the appropriate model to apply in the present case.

statements made by town officials concerning the impact that a large affordable housing project might have on the town's school system and the considerable costs that would result from the additional influx of students, those statements were not evidence of animus toward *familial status*. Furthermore, the trial court found that the only evidence offered by the plaintiffs that suggested any disparate treatment of *families with children* at the proposed affordable housing site was an alleged statement made by Sousa to the effect that the town would welcome senior housing rather than affordable housing without age restrictions. The trial court stated: "In the context of such a broad opposition as to any housing, the statements regarding additional costs to the town as a result of the influx of children are viewed by this court as opposing housing in general and not families specifically. Though such an analysis might beg the question as to whether a desire to preclude families with children begets a desire to prohibit housing or vice versa, the defendants' statements as to the increase of criminal activity and the supposed impact to the volunteer fire department support a general view that [the town] opposed the idea of (affordable) housing and not the presence of families with children." The trial court further stated that, although the intended condemnation of the parcel was improper in the context of affordable housing, namely, the first and second counts of the amended complaint, there was no evidence to suggest that such a condemnation was also improper in the context of federal and state fair housing laws under a disparate treatment theory. Simply put, the trial court found that familial status was not a motivating factor, and concluded accordingly that AvalonBay had failed to prove a violation of the fair housing laws. Our review of the record indicates that the trial court's factual findings in support of its conclusion were not clearly erroneous.

AvalonBay and the amici argue that the trial court did not apply the proper legal standard to its fair housing claims. Specifically, AvalonBay and the amici contend that the trial court improperly required it to offer the type of evidence of animosity and open hostility that was provided in *LeBlanc-Sternberg* v. *Fletcher*, supra, 67 F.3d 412. We do not, however, read the trial court's memorandum of decision as requiring evidence of open hostility to support AvalonBay's fair housing claims. The trial court's reference to evidence of open hostility was made in its discussion of the "cumulative evidence" provided in *LeBlanc-Sternberg*, which led the Court of Appeals to conclude that the plaintiffs in that case had established a violation of the fair housing laws. In *LeBlanc-Sternberg* v. *Fletcher*, supra, 431, the cumulative evidence offered by the plaintiffs *included* evidence of open hostility to the Hasidic Jewish population, as well as evidence of various zoning restrictions and differential treatment in the granting of variances. Indeed, in that case, the court expressly stated that discriminatory intent could be inferred from the totality of the circumstances, including: "[T]he fact, if it is true, that the law bears more heavily on one [group] than another . . . as well as the historical background of the decision . . . [t]he specific sequence of events leading up to the challenged decision . . . contemporary statements by members of the decisionmaking body . . . and [s]ubstantive departures . . . particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached . . . ." (Citations omitted; internal quotation marks omitted.) Id., 425. In reliance on *LeBlanc-Sternberg*, the trial court in the present case stated that "that case illustrates the type of cumulative evidence needed to establish a fair housing action against a municipality under a disparate treatment theory." Nowhere in the trial court's decision is there any suggestion that the

trial court *required* AvalonBay to present specific, open hostility evidence and that it based its decision on the lack thereof.

AvalonBay also argues that the trial court found that familial status was one of the factors motivating the defendants, but nonetheless found for the defendants on its fair housing claims. AvalonBay points specifically to the trial court's statement: "The cumulative evidence suggests that the town, in an effort to stop any housing from proceeding on the site, and in an effort to preserve its industrial zone, would most likely have had condemned the site in the same fashion even if the town did not buttress its position with political rhetoric as to the costs associated with an influx of families with children." We do not read the trial court's statement as a finding that familial status was a motivating factor underlying the defendants' actions. Instead, the trial court viewed the defendants' statements concerning families with children, not as evidence of a discriminatory purpose, but as "grossly exaggerated" statements made in an effort to boost support for the project plan. The trial court's citation to *Smith & Lee Associates, Inc.* v. *Taylor*, 102 F.3d 781, 790 (6th Cir. 1996), immediately following the court's statement that AvalonBay challenges herein, buttresses our conclusion that it was not based on an improper understanding of the applicable legal principles, because that case reiterates the rule that "[p]laintiffs must show that discriminatory purpose was a motivating factor in the [defendants'] decision . . . ." (Internal quotation marks omitted.) See also id., 791, quoting *United States* v. *Parma*, supra, 661 F.2d 575 (" '[t]here is no requirement that . . . intent be the sole basis of official action, if it is a motivating factor' ").

AvalonBay further argues that the trial court's conclusion in favor of the defendants on its fair housing claims is inconsistent with its factual findings related to counts one and two, and "implie[s] that the standard for [a

Federal Housing Act] violation is even higher than the bad faith/pretext standard it applied in enjoining condemnation of the AvalonBay property." AvalonBay refers specifically to the trial court's statement: "While, as discussed . . . above in regards to AvalonBay's first and second counts, the condemnation of the site might be improper in the context of affordable housing, there is no evidence to suggest that such a condemnation is also improper in the context of fair housing under the disparate treatment theory." Contrary to the suggestion of AvalonBay, the trial court's statement merely acknowledged that the standard that was applied to enjoin the project plan on the basis of bad faith was *different from*, but not necessarily *lower than*, the standard applied to AvalonBay's fair housing claims. Stated another way, a finding that a project plan was adopted in bad faith in an effort to prevent affordable housing does not necessarily require a finding that familial status was also a motivating factor in the adoption of the project plan.

In sum, the evidence does not warrant a conclusion that the trial court's factual findings were clearly erroneous or based on an improper understanding of the applicable legal principles. AvalonBay simply failed to carry its burden of proving that the defendants' articulated legitimate, nondiscriminatory reason for its actions was a pretext for discriminating against families with children.

The judgment is affirmed with respect to the first and third counts of the plaintiffs' amended complaint, namely, the injunction against the implementation of the project plan and AvalonBay's fair housing claims; the judgment is vacated with respect to the second count of the plaintiffs' amended complaint, namely, the injunction against the taking of the AvalonBay parcel.

In this opinion the other justices concurred.