[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION REGARDING MOTION TO DISMISS
The plaintiff, 1055 Stamford Associates Limited Partnership ("plaintiff" and/or "1055"), has commenced this civil action seeking to (i) set aside the conveyance to ("33 Broad Street Associates") of certain Parcels, by the Urban Redevelopment Commission ("URC"), and (ii) enjoin the development of the 33 BSA Property by Target Corporation ("Target"). The defendants have moved to dismiss Counts one through eight and Counts fifteen and sixteen of the Amended Complaint for lack of subject matter jurisdiction based upon the plaintiffs lack of standing.
 Facts
A. The Parties
After a five day evidentiary hearing, the court makes the following findings of fact. The plaintiff is a Massachusetts limited partnership engaged in the business of developing real property. Pursuant to a 105-year lease, the plaintiff is the lessee of property located at 1055 Washington Boulevard, Stamford, CT. This property, including a ten story office building, is owned by the estate of Oscar DeLima (the "DeLima property").
The defendant, the City of Stamford (the "City"), is a municipality organized pursuant to the laws of the State of Connecticut. The defendant, the Urban Redevelopment Commission for the City of Stamford ("URC"), is a redevelopment agency within the meaning of C.G.S. §§ 8-124
et seq. (the Redevelopment Act) that operates within the City of Stamford. The defendant, 33 Broad Street Associates, LLC ("33 BSA") currently holds title to property comprised of contiguous parcels which encompasses the street addresses 15 Broad Street through 55 Broad Street in Stamford, Connecticut. 33 BSA obtained certain parcels now comprising CT Page 13909 parts of the 33 BSA property by way of a 1998 Settlement Agreement with the City and the URC. The 33 BSA property abuts the plaintiffs property along parts of the plaintiffs northerly and easterly borders.
The defendant, Target Corporation ("Target"), is a Minnesota corporation with a principal place of business in Minneapolis, Minnesota. 33 BSA has contracted to sell the 33 BSA property to Target, and Target has applied to the City for permission to develop that property with a 510, 000 square foot, six-story structure. The City has approved Target's development proposal.
B. The URC and The Urban Renewal Plan
On March 4, 1963, the Board of Representatives of the City, acting under authority of the Connecticut Redevelopment and Urban Renewal Act (the "Act"), approved an Urban Renewal Plan for the Southeast Quadrant (Extended) — Urban Renewal Project Conn. S-43 (the "Plan") and conferred upon the URC certain regulatory authority over the Southeast Quadrant. The Southeast Quadrant included Block 9 (bounded by Broad Street, Washington Boulevard, West Park Place and Summer Street) and Block 8 (bounded by Broad Street, Summer Street, Main Street and Atlantic Street).
The Plan, which has been amended thirty one times since 1963, sets forth development objectives for the Southeast Quadrant; provides various land use and building requirements; identifies specific properties within the Southeast Quadrant "to be acquired" by the URC; and provides for the disposition of properties owned by the URC to designated redevelopers ("Reuse Parcels" via contracts for sale or lease ("land disposition agreements").
The public purpose of the Redevelopment Act as set out in § 8-124, is the eradication and prevention of substandard, insanitary, deteriorating, slum or blighted areas.
The URC, under C.G.S. §§ 8-135, 8-151, 8-154a and 8-163, can receive funding from the United States Government, the State of Connecticut, and the City of Stamford, for the redevelopment of the redevelopment area.
Section II of the Urban Renewal Plan sets the "Land Use Plan," and provides, in pertinent part, in § II. 2.
 a) Specifically one of the major purposes of the Urban Renewal Plan is to provide a physical environment which will attract investment of private capital to CT Page 13910 this Central District, so that the social and economic potential of the City may be realized.
b) To that end, it is stated that:
 c) All buildings, structures, arrangements of uses, landscaping, etc., erected or constructed or rehabilitated in a project area shall be of a design consistent with the purpose and character of the area set forth in this plan. In order to carry out this objective, the Urban Redevelopment Commission shall require that all plans of building, structures, arrangements of uses, landscaping, signs, paving, etc. must be approved by the Urban Redevelopment Commission before such construction may take place. . . . The Urban Redevelopment Commission . . . shall have the right to review such site and building plans on the basis of: Conformity with the specific controls and requirements herein set forth; architectural or aesthetic compatibility of proposed structure or landscaping design with its environs . . . any other factors which may affect the health and safety of persons or value of property.
C. Description of Subject Properties
The 33 BSA property is located within Block 9 of the Southeast Quadrant. The BSA Property at issue in this case is actually comprised of five separate "parcels" designated as follows:
_ Reuse Parcel 20
_ Reuse Parcel 20A (a/k/a Twenty-One Broad Street)
_ The "Dolan" Parcel
_ Reuse Parcel 19A
_ Reuse Parcel 19C
33 BSA acquired the parcels in the following manner. On or about April 16, 1968, the URC and the City entered into a land disposition agreement ("LDA") with Stamford New Urban Corporation ("SNUC") for the redevelopment of certain Re-Use Parcels in accordance with the Urban CT Page 13911 Renewal Plan. The SNUC LDA provided for the sale of Re-Use Parcels 19A and 20 by the URC to SNUC upon the completion of certain redevelopment conditions. The 1968 SNUC LDA identified SNUC as the "Redeveloper" of the Re-Use Parcels identified in the contract. 33 BSA is a successor and assignee of SNUC rights in the LDA.
The 1968 SNUC LDA identifies each Re-Use Parcel by number, and assigns a purchase price for each parcel. The 1968 SNUC LDA purchase price for the Re-Use Parcels 19A and 20 were: Re-Use Parcel 19A, $309,540.00; and Re-Use Parcel 20, $70,000.00.The 1968 SNUC LDA was amended on August 31, 1976 and again on December 19, 1978. The 1978 SNUC LDA provided that the price for Re-Use Parcel 20 was changed to $84,630.00.The LDA provided that the redeveloper was to develop Re-Use Parcel 20 with a minimum of 6, 000 square feet Commercial development, and 19A with a minimum of 10,000 square feet. As a result of the URC acquisition of Re-Use Parcels 19A and 20, and the SNUC LDA, Re-Use Parcels 19A and 20 were removed from the City of Stamford Tax rolls from as far back as 1968 until at least some time in 1998. Accordingly, taxes were not paid on these properties for thirty years.
BSA's ownership of the 33 BSA Property came about through the purchase of Reuse Parcels 20, 19A and 19C from the URC in 1998 pursuant to the terms of a 1998 Settlement Agreement between a number of parties, including the City, URC, and 33 BSA (the "1998 Settlement Agreement") which settled pending litigation between the parties. This agreement superceded the 1968 land disposition agreement. 33 BSA combined the Reuse Parcels with Parcel 20A and the Dolan Parcel, neither of which were acquired from the URC, to form the 33 BSA Property.
D. The 1998 Settlement Agreement and Amendment to the Plan
One issue addressed in the 1998 Settlement Agreement was the extent of URC's continued jurisdiction over the 33 BSA Property. 33 BSA sought to eliminate URC jurisdiction over the 33 BSA Property. The URC, however, was not prepared to relinquish total authority. The compromise was to relax, but not to eliminate, the controls imposed on the 33 BSA Property. The parties expressed their agreement as follows:
 City/Agency Obligation to Amend Plan. The city and Agency shall upon execution and approval of this Agreement, amend the Plan to indicate (i) that the building requirements of the Plan are not required for Reuse Parcels 19A, 19C and 20 and that a minimum of 40, 000 square feet of improvements without specification of type of use will be developed on all or part of the CT Page 13912 Combined Development Parcel and the maximum development of these parcels will be as permitted by applicable zoning regulations of the City of Stamford, plus the relocated development rights as described in Section 6, below; and (ii) that there shall be no schedule for the development of improvements upon the Combined Development Parcel.
The 1998 Settlement Agreement provided for the amendment of the Plan to implement the terms of the settlement. Accordingly, Plan Amendment 97-1 was prepared by the URC staff providing in relevant part as follows:
 3. Section II.2.B., Controls for CBD Retail Area, is amended to read, in its first line, as follows:
 "The following controls shall apply to Reuse Parcels 19A, 19C, 20 and 20A."
 Section II.2.B., Controls for CBD Retail Area, is further amended by the addition of a new sub-section (3) to read as follows:
(3) Reuse Parcels 19A, 20, 19C, 20A
 Not less than 40, 000 square feet of improvements, without specification of type of use, shall be developed on Reuse Parcels 19A and/or 20, and the maximum development of these parcels and Reuse Parcels 19C and 20A will be as permitted by applicable zoning regulations of the City of Stamford plus relocated development rights from property now or formerly owned by TR Hardy, LLC.
 5. Section II.2.K., Duration of Controls, is amended to delete reference to Reuse Parcels 19A, 19C and 20.
The clear intended effect of Amendment 97-1 was to impose minimum development requirements on 33 BSA but otherwise relieve the 33 BSA Property of URC controls, including the requirement of securing URC approval of any construction plans.
Before being approved by the URC, both the 1998 Settlement Agreement and proposed Plan Amendment 97-1 were exposed to the public in a lengthy review process. That process was as follows: CT Page 13913
 August 22, 1997 — The Settlement Agreement and resulting sale to 33 BSA was approved by the URC in a Special Meeting. The Special Meeting was publicly noticed. The litigation with 33 BSA was listed on the public agenda posted in advance in the Town Clerk's office.
 September 30, 1997 — The Board of Representatives' Urban Renewal Committee held a meeting of the whole (the entire Board was invited) to discuss the Settlement Agreement. The Board therefore directed the Committee to hold a public hearing on the Settlement Agreement.
 October 22, 1997 — The Stamford Board of Representatives' Urban Renewal Committee held a public hearing regarding the Settlement Agreement. After the hearing, the Committee voted to approve the Settlement Agreement.
 November 5, 1997 — A regular meeting of the Board of Representatives was held, where the Settlement Agreement and resulting sale was approved. The Settlement Agreement with 33 BSA was again listed on the agenda of the meeting posted in advance in the Town Clerk's office.
 November 13, 1997 — Following a public hearing, URC Resolution 419 was approved adopting Plan Amendment 97-1 subject to the approval of the Board of Representatives.
 December 9, 1997 — Pursuant to the URC's request, the City of Stamford Planning Board unanimously approved a motion declaring that the Plan Amendment conformed with the City's master plan.
 January 28, 1998 — the Board of Representatives' Urban Renewal Committee held a public hearing and voted unanimously to recommend approval of the Plan Amendment to the entire Board.
 February 2, 1998 — Plan Amendment 97-1 was unanimously approved by the Board of Representatives in its regular meeting. Consideration of the proposed Plan Amendment was again listed on the agenda of the meeting posted in advance in the Town Clerk's office.
Plaintiffs principal, Mr. Miller, was apprised of these events through his subscription to the URC minutes and agenda and notices posted pursuant to the Freedom of information Act. No action was taken by Mr. Miller to challenge the 1998 Settlement Agreement until this action was commenced in July 2002 even though he admits that he was aware of the terms of the 1998 Settlement Agreement within one year after it was executed. CT Page 13914
Moreover, Mr. Miller personally attended the November 13, 1997 regular Meeting of the URC wherein Proposed Amendment 97-1 (incorporating the changes to the URC Plan required by the Settlement Agreement) was explained and discussed. Mr. Miller raised no objection.
Pursuant to the terms of the Settlement Agreement, Reuse Parcels 19A and 20 were conveyed to 33 BSA on September 4, 1998. The URC was paid $309,540 for Reuse Parcel 19A and $84,630 for Reuse Parcel 20 which were the amounts provided for under the amended land disposition agreement.
Additionally, pursuant to the terms of the Settlement Agreement, the URC and 33 BSA each engaged their own appraisers to value Reuse Parcel 19C. Both appraisals were exchanged, and an arbitration proceeding was commenced to resolve the value issue. During the course of the arbitration the parties negotiated a price of $175,000. Parcel 19C was conveyed by URC to 33 BSA for that amount on December 21, 1999.
The proceeds of the sale of Parcels 20, 19A and 19C were deposited into URC's own bank account as a return of federal funds. Those proceeds are not due the City, and cannot be used or claimed by the City.
Commencing with the 1998 list year, Reuse Parcels 20, 19A and 19C have been assessed and taxed by the City Assessor at their full fair market value.
With the exception of a small, derelict, unoccupied building, the 33 BSA property has been and remains undeveloped. Plaintiff admits that the failure to develop surrounding property has hurt the value of its property.
At all relevant times, the land use and building requirements imposed upon Reuse Parcels 19A, 19C and 20 under the Plan have expressly permitted retail, office, personal service and theater uses. Structures on the parcels were permitted to occupy up to 100% of each parcel. The Plan imposed no height or setback limitations on structures built on the 33 BSA property.
D. Plaintiffs development of the DeLima Property
The DeLima property, leased by plaintiff, is also located in Block 9. The URC has never held title to or disposed of the DeLima Property.
The plaintiff became interested in developing properties in Stamford in 1984. Raymond Miller, one of the limited partners of the plaintiff, CT Page 13915 already had extensive commercial real estate experience dating back to 1969. While it is unclear whether Miller reviewed the Urban Renewal Plan ("Plan") prior to commencing development of the property, it is clear that he did not believe it had any bearing on the type of structure plaintiff could build and that he did not even provide the Plan to his architect, Richard Green of Stubbins Associates. Specifically, he did not provide Green with the Urban Renewal Plan because ". . . it had no indication in it about what we could build specifically on Block 9 . . ."
In 1984, the URC had retained the Delta Group, a consulting firm out of Philadelphia, Pennsylvania that prepared a Conceptual Plan for Blocks 8 and 9 (Delta Plan). The Delta Plan recommended commercial office development, 100 units of residential development and a single large underground public parking garage in Block 9, located beneath properties owned or controlled by the URC.[1]
In October 1984, Miller and his architect, Green, worked with the Delta Group to obtain its input regarding the preliminary designs for the plaintiffs ten story office building. The building that the architect designed for 1055 was different than the Conceptual Plan in that it was not "stepped" as shown in the Delta Plan, was taller than what was provided for in the Delta Plan and had larger floor plates.
In November 1984, the plaintiff presented preliminary plans for the URC's approval. The URC did not require that plaintiff lower the structure or revert to the fully stepped design shown n the Conceptual Plan. After discussions with the URC, the plaintiff decided to upgrade the building's exterior from pre-cast concrete to polished granite and decided to step back the tenth floor to create a penthouse effect. In addition, the plaintiff enclosed mechanical equipment on the roof in a granite-clad penthouse with a curved metallic sculpture. After discussions with the URC, the plaintiff also agreed to provide retail space at street level and enclose the parking garage. The URC also requested and plaintiff agreed to construct the garage part of the building on the property line as opposed to the setback proposed by the plaintiff In 1985, after the plaintiff agreed to make the changes and redesigned the building, the URC approved the plaintiffs proposal for 1055 Washington Boulevard. The plaintiff proceeded to construct its building and, at its completion, the plaintiffs building was the first new building completed in Block 9.
1055 currently operates the building as an income generating property, leasing space to various subtenants. The northerly side of the 1055 Building extends within ten (10) feet of the boundary of the BSA Property. The easterly side of the 1055 Building extends up to the CT Page 13916 boundary of the BSA Property. Even though the tenants on the northerly side of the 1055 Building have always had an unobstructed view of Broad Street, approximately one-half of the rentable space on floors 3-8 of the north side of the building is currently vacant. The proposed Target store will partially obstruct that view. The best views from 1055 are to the west and to the east. The view to the east from the office building is currently unobstructed. However, in 1999, the URC and the City sued the plaintiff seeking a declaratory judgment. As part of that action, the URC alleged that it plans to build a large parking garage that may exceed 70 feet along the east side of the plaintiffs building. This garage would have no setback between the plaintiffs building and the proposed garage. The case was ultimately dismissed. However, the URC and the plaintiff are still involved in an active dispute whether the URC can build this garage which will obstruct the plaintiffs view to the east. Because it is so displeased with the proposed parking garage by the URC, the plaintiff has stated its intention "to exercise our legal rights to block any new development on Block 9 until a satisfactory Master Plan has been developed and agreed to by all parties."
E. Plaintiffs Status As Taxpayer:
As a limited partnership, the plaintiff is not obligated to pay and does not pay any federal or Connecticut state income tax. Its income flows through to its partners who may or may not be taxed depending upon their income from the limited partnership and other sources. The plaintiff does pay real estate taxes to the City of Stamford.
F. Contract of Sale from 33 Broad Street Associates to Target
In May 2001, 33 BSA contracted to sell the 33 BSA property to Target for $13,000,000.00, conditioned on the City's granting permission to Target to construct a retail store. As a contract purchaser, Target applied to the City for approvals to develop the 33 BSA property with a six-story retail building encompassing approximately a half million square feet of building area. As proposed, the Target building will partially obstruct views to the north from the north side of the 1055 office building. The proposed building would lie a minimum of twenty feet and a maximum of forty-eight feet from the plaintiffs building along the northern side and a small portion of the eastern side of 1055. The Target building would have no windows facing the plaintiffs building and some of the sides of the building would not be covered with a high quality finish. The Target proposal also sought to have the western end of the property which covers Re-Use Parcel 20 designated as a "future development parcel". CT Page 13917
While Target's use and building are permitted as a matter of right, two Special Exceptions were required from the Stamford Zoning Board in order for Target to position its building on the Property in the manner deemed necessary by Target.[2]
Target thus applied to the Zoning Board for the requested Special Exceptions. At the public hearings on Target's application, Mr. Miller testified in strong opposition to Target's application. URC's General Counsel testified in full support of the Target proposal.
After closing a lengthy hearing, the Zoning Board granted Target the requested Special Exceptions. At the time Target made its presentation regarding the special exceptions it presented an L shaped tower as a possible development of the future development lot. The Zoning Board only approved the future development lot for landscaping. The Zoning Board expressly found that the Target proposal is in conformance with permitted zoning and is appropriate with respect to other structures and uses adjoining the site. The Zoning Board also expressly found that with regard to the Target proposal, the arrangement, location, apparent bulk, architectural features, materials, and textures of the proposed building are compatible and complementary with the character and design of the vicinity.[3]
The easements proposed to be created by the proposed Construction Access and Easement Agreement run through Parcel 19 B which is not owned by plaintiff or 33 BSA. Plaintiff offered no credible testimony as to the effect those easements would have on traffic and parking.
The Fair Market Value of Plaintiff's Property
Plaintiff contends that if the Target store is built it will reduce the fair market value of the 1055 building. Plaintiff concedes that the fair market value of the plaintiffs building has suffered due to the lack of redevelopment surrounding it. However, plaintiff did not produce any evidence regarding the economic impact on 1055 of the continuing failure to develop surrounding property. The plaintiff also contends that the URC construction of the proposed parking garage to the east of plaintiff's building parcel will significantly impair the fair market value of the plaintiffs property but did not present evidence of what this decrease in value would be.
In March 2000, the plaintiff, through counsel, filed a tax appeal with the Board of Assessment Appeals of the City of Stamford. The appeal related to the Grand List of October 1, 1999. The assessor had concluded that the fair market value of the plaintiffs property was $25.8 million. CT Page 13918 The plaintiff contended that it was only $15 million.
During trial, John Leary, an MAI appraiser, rendered an opinion that the current fair market value of the plaintiffs property is within a range of $34 to $36 million. Mr. Leary also rendered an opinion concerning the impact upon the fair market value of the plaintiffs property caused by the proposed Target store without future development on the corner parcel and with future development on the corner parcel.
Mr. Leary was not asked to and has not rendered an opinion concerning any impact upon the fair market value of the plaintiffs property caused by the 1998 Settlement.
Mr. Leary's opinions relating to value impact caused by the Target store are based upon certain assumptions, including the following:
a. That the total affected area on the north side of the 1055 Building is 23, 625 square feet, or all of the offices on the north side of floor3-8, inclusive, up to 30 feet inside the window wall;
b. That market research conducted by Mr. Leary shows that tenants will pay between 10 and 15 percent less rent for office space with obstructed views than for office space without unobstructed views; and
The court finds that Mr. Leary's assumptions are invalid for the following reasons:
a. The "total affected area" is inflated because it does not properly take into account the facts that (i) approximately 50 percent of this space is currently vacant; (ii) some of the affected area space has views to the west or east, which are preferred to the northerly views;
b. The market research was inadequate and unreliable because: (i) the universe surveyed of 25 participants includes incomparable properties from Massachusetts to Washington, D.C. to Chicago, IL; and (ii) Mr. Leary knew little or nothing about most of the properties upon which he relied (e.g. Olympia Center in Chicago); and, in at least one case (the D.C. property) the information was outdated and unverified;
c. No credible evidence was presented that the loss of less than two percent of net operating income derived from an office building necessarily results in a diminution of fair market value of the entire building; and
d. He did not take into account the plaintiffs claims that the fair CT Page 13919 market value of its property will be adversely impacted by the public parking garage.
As a result of the foregoing, the court gives no weight to Mr. Leary's conclusion. Additionally, Mr. Miller's conclusory statements regarding reduced rents and fair market value was not supported by any facts. Accordingly, no credible evidence was presented that the partial obstruction of the 1055 building's views by the Target proposal will reduce the rents or will cause the fair market value of the building to decline.
 Standing Allegations
The plaintiff alleges that it has standing based on theories of classical aggievement, taxpayer standing and its status as a resident, property owner and redeveloper within the URC's redevelopment area. The plaintiff claims that it has suffered harm as a result of the settlement agreement and relaxation of URC controls and that it will suffer future harm if Target is allowed to proceed with its store.
Specifically, plaintiff alleges that the URC's and the City's failure to exercise control over re-use parcels 19A and 20, has caused detriment to the plaintiff because the Target Store is larger and more massive than what the URC would have allowed.
Plaintiff also contends that the Target store will be closer to the plaintiffs property, will have more square footage and will have more retail space than the URC would have allowed if it had not relinquished control in the Settlement Agreement.
Plaintiff also alleges that the easement that the URC has proposed will increase traffic and congestion, negatively impacting the plaintiffs property interest.
The plaintiff further alleges that the URC failed to follow applicable statutory procedures in connection with parcels 19 and 20 and that it has been denied its rights under the Redevelopment Act in that its consent was not requested as to the Settlement Agreement, the modification to the Urban Renewal Plan and the creation of the easement to benefit Target.
The plaintiff further contends that its rights to due process and meaningful participation were violated in that the URC and the City did not provide adequate notice as to the true purpose of Plan Amendment 97-1 so as to provide the opportunity to meaningfully participate in the public hearing on that proposed amendment. CT Page 13920
The plaintiff further claims that Plan Amendment 97-1 was in effect an entirely new redevelopment plan, that required the URC to follow all the procedures set forth in § 8-127 in connection with adopting a new redevelopment plan, and that it failed to do so, depriving the plaintiff of its rights to a full hearing on the proposed changes for re-use parcels 19A and 20 that the URC sought to implement by Plan Amendment 97-1.
Finally, plaintiff alleges that it has tax payer standing because the actions of the URC in selling the parcels in 1998 at 1968 and 1978 prices also deprived the City and its taxpayers of the fair market and use value of these parcels.
Defendants have now moved to dismiss Counts one through 8, and Counts Fifteen and Sixteen of the plaintiffs Amended Complaint dated August 27, 2002 for lack of subject matter jurisdiction based upon the plaintiffs lack of standing to sue.[4]
 DISCUSSION
Plaintiff must have standing to assert those claims in order for the court to have subject matter jurisdiction over them. Ganim v. Smith Wesson Corp., 258 Conn. 313, 346 (2001); Williams v. Commission onHuman Rights Opportunities, 257 Conn. 258, 264-65 (2001).[5]
A motion to dismiss is the proper vehicle for challenging a plaintiffs standing to sue, and must be granted if the plaintiff does not have a legally cognizable interest in the subject matter of the challenged action. See Ganim, 258 Conn. at 346-47; Wilcox v. American MaterialsCorp., 2002 Conn. Super Lexis 1118, *15 nt. 3 (J.D. Hartford 2002).
Once such a motion to dismiss is made, plaintiff has the burden of establishing standing. Sadloski v. Manchester, 235 Conn. 637, 648-49
(1995). Mystic Marinelife Aquarium, Inc. v. Gill, 175 Conn. 483, 493
(1978) ("The determination of aggrievement presents a question of fact for the trial court, and a plaintiff has the burden of proving that fact.").
Once the moving party places jurisdictional facts in issue, the plaintiff can not simply rely on the pleadings, but must adduce sufficient evidence to rebut the defendants' evidentiary showing. Amore v. Frankel,228 Conn. 358, 368 (1994).
In an injunction proceeding, if resolution of a disputed fact is CT Page 13921 necessary to establish the existence of standing a hearing may be held in which evidence is taken. Weidenbacher v. Duclos, 234 Conn. 51, 54 fn. 5 (when issue of fact must be resolved to determine jurisdiction due process requires a trial-like hearing). Herzog Foundation v. University ofBridgeport, 41 Conn. App. 790, 793 (1996.)
In order to meet its burden, plaintiff must show: (a) it is authorized by statute to bring suit; or (b) it has so-called "taxpayer" standing; or (c) it has been "classically aggrieved" and thus has standing under common law. See Avalon Bay Communities v. Town of Orange, 256 Conn. 557,568 (2001); Alarm Applications Co. v. Simsbury Volunteer Fire Comm.,179 Conn. 541 (1980).
In order to establish standing to pursue Counts One through eight, and fifteen and sixteen, plaintiff must establish that it is aggrieved by the 1988 Settlement Agreement and associated Plan amendments — whether it be statutory aggrievement or aggrievement as a taxpayer, by a fair preponderance of the evidence.[6] The Great Atlantic and Pacific TeaCo., Inc. v. Branford Planning and Zoning Commission,1999 Conn. Super LEXIS 2375 (J.D. New Haven at New Haven August 31, 1999) (finding that plaintiff had failed to establish by a fair preponderance of the evidence, that it was classically aggrieved by action of the Planning and Zoning Commission); Corecki v. Planning and Zoning Commission ofClinton, 1995 Conn. Super LEXIS 2024 (J.D. of Middlesex at Middletown, July 7, 1993) (finding that plaintiffs failed to sustain their burden of proving statutory or classical aggrievement using a fair preponderance of the evidence standard).
A. Authorization by Statute
Plaintiff is not the owner of the property at 1055 Washington Boulevard and therefore cannot claim standing on this basis. Plaintiff contends, however, that even if it is not the owner of the property it has standing to challenge actions taken by the URC concerning the 33 BSA property in which plaintiff also holds no ownership interest. While statutory authority to challenge administrative actions concerning the property of others has been granted by the legislature in the context of actions taken, for example, by a local zoning board (C.G.S. § 8-8) or the Commissioner of Environmental Protection (C.G.S. § 22a-34), no similar statutory authority exists for challenging actions of the URC. In fact, plaintiff concedes that the "Redevelopment Act does not provide an express cause of action to those such as the plaintiff who claim harm from the decision of redevelopment authorities."
Plaintiff argues, however, that it has statutory standing to challenge CT Page 13922 the 1998 Settlement Agreement and associated Plan amendments by virtue of its alleged status as a "redeveloper." However, even if the court was to find that plaintiff is a "redeveloper" within the Act, and while redevelopers do have certain rights and obligations under the Act (see
Conn. Gen. Stat. § 8-136 and 8-137), the Act does not confer upon redevelopers a private right of action to challenge the decisions of redevelopment agencies. Compare Conn. Gen. Stat. § 8-136 (conferring upon property owners whose properties are taken by a redevelopment agency a right to seek judicial review of the agencies' compensation decision); and see Antimerella v. Rious, 229 Conn. 479, 495 (1994) ("when the legislature has authorized supplementary private causes of action, it has done so expressly.")
While unclear, it appears that plaintiff may also be arguing that it has statutory standing under the Redevelopment Act because it is a resident and property owner in the zone of interest to be protected by the Act. Plaintiff is not a property owner and there is nothing in the Act that confers a private right of action for residents.
B. Taxpayer Standing
To establish taxpayer standing, plaintiff must first allege and then demonstrate that it is a taxpayer, and that the allegedly improper municipal conduct about which it complains caused 1055 to suffer "some pecuniary or other great injury." See Alarm Applications Co., Inc. v.Simsbury Volunteer Fire Co., 179 Conn. 541, 549 (1980), citing Bassettv. Desmond, 140 Conn. 426, 430 (1953). The first requirement ensures that there is some "legal relationship or nexus between the plaintiff and the municipal entity that establishes the municipality's duty to expend or allocate tax monies in a manner consistent with law," whereas the second requirement ensures that "the litigants have a specific, legal interest, as distinguished from a mere general interest, in the subject matter of the controversy." Alarm Applications Co., Inc. v. Simsbury Volunteer FireCo., Supra 179 Conn. 549. and cases cited.
Plaintiff has failed to show the requisite injury necessary to establish standing because plaintiff has not demonstrated: (a) a direct injury as a taxpayer; and (b) that the 1998 Settlement Agreement caused a net economic detriment to the City.
 Plaintiff Has Not Demonstrated Direct Injury As Taxpayer
In order to establish the requisite injury to establish taxpayer standing, a taxpayer plaintiff must first establish that the municipal conduct in question will in fact affect the taxpayer's pecuniary CT Page 13923 interests as a taxpayer. Sadlowski v. Town of Manchester, 235 Conn. 637,647 (1995).[7]
First, the evidence adduced at the hearing established that the plaintiff, a Massachusetts limited partnership, pays no federal or state income taxes. Plaintiff cannot impute to itself income taxes paid by its limited partners. It is axiomatic that a limited partnership is a separate legal entity from its limited partners and this legal distinction cannot be ignored for purposes of analyzing standing. See e.g. Fidelity Trust Co. v. Bud Assoc., 196 Conn. 270, 279-82 (1985). SeeD.P.S. Associates v. Planning and Zoning Commission, 27 Conn. App. 508,512 (1992) (affirming dismissal of partnership's zoning appeal where subject property was actually owned by partners' corporation).
Additionally, a taxpayer has no standing where its complaint about a proposed municipal expenditure focuses on moneys that are not derived from, or destined for, the City's tax revenues. See, e.g., Bassett v.Desmond, 140 Conn. 426, 430-431 (1953)[8]; Double I Limited Partnershipv. Town of Glastonbury, 14 Conn. App. 77 (1988)[9]; Sadloski v. Town ofManchester, 1997 Conn. Super. LEXIS 1250 (J.D. Hartford-New Britain, May 2, 1997).[10]
Even though plaintiff does pay taxes to the city, plaintiff has not established a direct injury as a Stamford taxpayer because the sale of Parcels 20, 19A and 19C had no impact on City funds. The unrefuted testimony establishes that the URC received no funding from the City to purchase Reuse Parcels 19A, 19C and 20 and no funds generated from the sale of those Reuse parcels were transferred to the City's coffers. Furthermore, plaintiffs arguments concerning the potential future effect of the Settlement Agreement on its property taxes are far too speculative to create taxpayer standing.
Thus, plaintiff has not established any cognizable impact of the 1998 Settlement Agreement on its own taxes, and therefore can not establish its standing as a taxpayer to challenge that agreement.[11]
Plaintiff Cannot Demonstrate A Net Economic Detriment To the City
Finally, even assuming, arguendo, that the 1998 Settlement Agreement and conveyance of Reuse Parcels 20, 19A and 19C somehow impacted plaintiffs taxes, plaintiff has nevertheless failed to establish taxpayer standing. The Connecticut Supreme Court has made clear that where there is an impact on a municipality's tax base from a proposed project, a plaintiff must show a net economic detriment to the municipality to establish taxpayer standing. Sadloski v. Town of Manchester supra. CT Page 13924
Plaintiff has failed to establish standing because it has failed to show a net economic detriment to the City as a result of the 1998 Settlement Agreement or the sale of the Property to 33 BSA for less than its alleged fair market value. To the contrary, Reuse Parcels 19A, 19C and 20 were off the tax rolls for approximately thirty years prior to 1998, and therefore were not generating income for the City. The 1998 Settlement Agreement actively restored Reuse Parcels 20, 19A and 19C to the City's tax rolls, generating in excess of $330,000 in tax revenues for the City since 1988. Furthermore, the value assigned to Reuse Parcels 20, 19A and 19C for tax purpose was unrelated to their sales price. They were assessed and have been taxed by the City based on their fair market value.
Finally, an "inference of detriment to tax revenues" based on plaintiffs allegations that the Settlement Agreement and associated Plan amendments did not accord with statutory procedures and requirements would be improper. Implicit in this argument is the contention that the URC would have sold Reuse Parcels 19A, 19C and 20 for a higher price had it complied with the Act. There was no credible evidence presented to support this argument. In any event, plaintiffs arguments do not support taxpayer standing. First, it was established that the revenues from the sale of Reuse Parcels 19A, 19C and 20 went to the URC; they were not and could not be channeled to the City of Stamford. Moreover, the Reuse Parcels were restored to the tax roles and taxed at their full fair market value. To the extent plaintiff contends that a higher sales price for the Reuse Parcels would have resulted in the URC spending more money in the Southeast Quadrant, no showing was made that such increased spending would have occurred and/or that such spending would have had an impact on plaintiffs taxes. Plaintiffs theory of taxpayer detriment is far too speculative to support a finding of taxpayer standing. See Rubinov. Malloy, 2001 Conn. Super. LEXIS 1708 *16 (J.D. Stamford-Norwalk 2001) (dismissing action for lack of standing; alleged tax increase resulting from challenged action was "mere speculation").
Accordingly, plaintiff lacks taxpayer standing to pursue Counts One through Eight of the Complaint. Plaintiff has not demonstrated that the 1998 Settlement Agreement and associated amendments to the Urban Renewal Plan have caused it to suffer any pecuniary or other injury in its capacity as a taxpayer or had any effect whatsoever on its payment of taxes to the City of Stamford.
In fact, the impact upon Stamford taxpayers such as the plaintiff was positive as a result of the 1998 Settlement Agreement and subsequent transfer of the 33 BSA Property because, the 33 BSA Property was restored CT Page 13925 to the tax roll at their full value as assigned by the City Tax Assessor, generating additional tax revenue for the City of Stamford.
C. Classical Aggrievement
Plaintiff has the burden of proving classical aggrievement. MysticMarine Life Aquarium v. Gill, 175 Conn. 483, 493 (1970).
In order to establish classical aggrievement, plaintiff needs to show: first, that it has a "specific, personal and legal interest in the challenged action as distinguished from a general interest, such as is the concern of all members of the community as a whole;" and second, that its "specific personal and legal interest has been specially and injuriously affected by the challenged action." Steeneck v. Univ. ofBridgeport, 235 Conn. 572, 579 (1995).
Each of the two prongs of the classical aggrievement test must be separately established. Where, as here, the plaintiff claims aggrievement from a decision directed to another person or entity, the plaintiff must first "establish the certainty of a "specific personal and legal interest in the subject matter of the decision . . .'" New England Rehab. Hosp. ofHartford, Inc. v. Commission on Hospitals and Healthcare, 226 Conn. 105,122-23 (1993), citing Cannavo Enterprises, Inc. v. Burns, 194 Conn. 43,47 (1984) (emphasis added). Specifically, plaintiff must demonstrate that it has a legally protected interest in the subject matter of the challenged action; this legally protected interest must be concrete and actual, and not merely hypothetical. New England Rehab, Supra226 Conn. 127; See also Gorecki v. Planning and Zoning Commission ofClinton, supra (finding that plaintiffs failed to establish a legally protected interest in the subject matter of the Planning and Zoning Commission's decision).
If the first prong of the classical aggrievement test is satisfied, plaintiff then must show a possibility, as distinguished from a certainty, that its legally protected interest has been adversely affected. New England Rehab., Supra, 123 n. 12.
Plaintiff has failed to show that it has any specific, personal and legal interest in URC's approval of the 1998 Settlement Agreement and associated Plan amendments relaxing URC controls on Reuse Parcels 20, 19A and 19C. At the outset, it is essential to note that unlike in Avalon BayCommunities, Inc. v. Town of Orange, 256 Conn. 557 (2001), where the Supreme Court found the plaintiff had standing, plaintiff in this case did not and does not own these parcels or have rights to develop it. CT Page 13926
Plaintiff contends it has a specific personal and legal interest in that action, because it is a "redeveloper" whose consent to any Plan amendments was required by Conn. Gen. Stat. § 8-136. Plaintiff further contends that by relinquishing its authority to review construction projects on Reuse Parcels 20, 19A and 19C, the URC deprived 1055 of protection from development that is "incompatible" with the 1055 Building.
Plaintiff is not a Redeveloper
 Connecticut General Statute § 8-136 provides as follows:
 A redevelopment plan may be modified at any time by the redevelopment agency, provided, if modified after the lease or sale of real property in the redevelopment project area, the modification must be consented to by the redeveloper or redevelopers of such real property or his successor or their successors in interest affected by the proposed modification. Where the proposed modification will substantially change the redevelopment plan as previously approved by the legislative body, the modification must similarly be approved by the legislative body.[12]
Plaintiff claims that its rights under Conn. Gen. Stat. § 8-136
were violated because it is a "redeveloper" under the broad definition of that term contained in § 8-125. However, reading the Act in a way that gives practical meaning to each of its provisions, status as redeveloper is only conferred upon those parties to whom a development agency actually transfers property for redevelopment purposes. See Katzv. Brandon, 156 Conn. 521, 532 (1968) citing Gold Realty Co. v.Hartford, 141 Conn. 135, 143 (1954). In this case, the development plan was modified to affect 33 BSA property, which the plaintiff did not and does not own. Additionally, plaintiff did not acquire its own property from the URC. The broad interpretation of "redeveloper" urged by plaintiff would prevent the URC from amending the Plan without securing the consent of every party who has ever constructed improvements within the Southeast Quadrant claimed to be affected by the amendment. There is no evidence that the legislature intended to so limit the ability of a redevelopment agency to amend an urban renewal plan. To interpret this statue in this manner would potentially strangle any ability of the URC to redevelop property. CT Page 13927
In sum, plaintiff has not demonstrated that it is a redeveloper giving rise to a legally protected interest in the subject matter of the 1998 Settlement Agreement or related Plan Amendments. Thus, plaintiff has no standing as a redeveloper.
 Plaintiff Has No Legally Protected Interest With Respect To The Development of The 33 BSA Property
The 1998 Settlement Agreement and associated Plan Amendments pertain exclusively to the 33 BSA Property. Plaintiff contends that it has a legally protected interest in development of the 33 BSA Property because plaintiff constructed the 1055 Building in reliance upon the Delta Conceptual Plan for Blocks 8 and 9 which, according to plaintiff, contemplated development of surrounding parcels in a manner that would not obscure the views from the 1055 Building. However, plaintiff failed to produce any kind of written contract or other enforceable document under which the URC or 33 BSA committed to restrict the development of the 33 BSA Property in accordance with the Delta Conceptual Plan. Moreover, the Delta Conceptual Plan was just "a conceptual plan". The evidence plainly established that development concepts for the 33 BSA Property have changed repeatedly, significantly, and without plaintiffs objection since the 1055 Building was constructed in 1985. Plaintiff wholly failed to establish that it has any legally protected rights with regard to the development of the 33 BSA Property. Plaintiff did not even build its own building in conformance with the Delta Plan. Additionally, plaintiff was aware by 1987 that the Delta Plan was not going to be implemented but took no legal action to enforce what it now claims to be its legal rights. Accordingly, the Delta Plan gave plaintiff no specific personal and legal interest to challenge the 1998 Settlement Agreement and associated Plan amendments.
 Plaintiff Had No Legal Interest In The URC's Authority Over the 33 BSA Property
Plaintiff does not have a cognizable legal right today to have the URC protect plaintiff from what it believes is "incompatible" development of a neighboring property.
Plaintiff has not cited, nor can any authority be found, to support the proposition that an agency which imposes design conditions on the developer of property is required to exercise control over contiguous properties in order to protect the developer's investment seventeen years later. Plaintiffs compliance with certain URC approval conditions in 1985 — even if that compliance involved an increased expense — gives it no specific personal or legal interest in the development of CT Page 13928 Parcels 20, 19A and 19C.
 Plaintiff Failed to Adduce Evidence of Harm Sufficient to Establish Standing
Even if Plaintiff had a legally protected interest with respect to the 33 BSA Property, there is no legal basis for concluding that such interest was adversely affected by the 1998 Settlement Agreement and associated Plan amendments. There is simply no causal connection between the complained of action and plaintiffs alleged injury.
The Settlement Agreement and associated Plan Amendments substantially relaxed the URC's "controls" over the 33 BSA Property. Plaintiff claims it was harmed by this action, because of the elimination of so called "compatibility review" of any development of the 33 BSA Property. Plaintiff attempted to demonstrate such harm by characterizing the Target building as incompatible with its own and by offering purported expert testimony to the effect that rents paid for space on the north side of the 1055 Building (the side facing the 33 BSA Property) will decline as a consequence of the Target project, thereby reducing the value of plaintiffs property.
Plaintiff's evidentiary showing was insufficient to establish standing to challenge the 1998 Settlement Agreement and associated Plan amendments for the following reasons:
 • The Target Building is entirely consistent with the use restrictions and building requirements of the URC Plan that pertain to the CBD Retail area.
 • No evidence was presented showing that the URC has any objections to the Target Building and/or would have rejected Target's building plans on the basis of "architectural or aesthetic" incompatibility.
 • The record reveals that the Zoning Board looked at the issue of compatibility and found that the Target building was compatible and complimentary with the character and design of the area.
 • There was no evidence that plaintiff has lost tenants or has been confronted with a demand for a rent concession or reduction as a consequence of the Target approvals.
 • There was no factual evidence presented to support Mr. Miller's conclusory statements that rental income and the value of the CT Page 13929 building will decrease.
 • Evidence to the effect that plaintiffs building will suffer an adverse economic impact in the future was based upon appraisal testimony that was not credible:
 • because the comparables utilized were not true comparables as evidenced by their locations and characteristics of those properties that were elicited at the hearing;
 • because the appraiser was plainly not familiar with the market in which the plaintiffs building is located; and
 • The decision of the Zoning Board with regard to the "out parcel" was limited to a landscape plan and expressly precluded any other development without a further application to the Zoning Board. Furthermore, the expert testimony which presumed a future building on the "out parcel" was not credible and the court gives it no weight.
Accordingly, the court attaches no weight to the testimony of the expert in this case.
 • Finally, and perhaps most importantly, the evidence presented demonstrates that the URC has historically acted in direct contradiction to plaintiffs allegations that the URC would have required a setback and would have protected plaintiffs views if it had continued to exercise control over the redevelopment of the 33 BSA property. The URC required plaintiff to build right up to the property line and remains involved in an active dispute with the plaintiff because it wants to obstruct the plaintiffs view to the east by constructing a tall parking garage.
 Accordingly, all of the evidence presented unequivocally demonstrates that there is no causal connection between the settlement agreement and relaxation of URC controls and plaintiffs alleged harm.
D. Plaintiffs Presence in the South East Ouadrant Does not Give itStanding to Object to the 1998 Settlement Agreement and Associated PlanAmendments.
Plaintiff also argues that its mere status as an "owner" and/or "resident" in the South East Quadrant confers upon it standing to challenge the 1998 Settlement Agreement and the associated Plan amendments, which were directed exclusively to the 33 BSA Property. CT Page 13930
The authorities cited by plaintiff do not support the novel concept of standing advanced by plaintiff. Neither of the two Connecticut cases cited by plaintiff even examine the issue of standing. Further, in UnitedOil Co. v. URC Stamford, 158 Conn. 364 (1969), both plaintiffs sued as Stamford taxpayers, and one as the owner of real estate being taken by eminent domain. Similarly, in Sheehan v. Altschuler, 148 Conn. 517
(1961), the plaintiffs were taxpayers and/or owners of real estate within the challenged redevelopment area. Thus, while the issue of standing was not addressed in United Oil and Sheehan, the ostensible basis for standing was taxpayer standing and/or classical aggrievement. There is no language in those cases creating a new breed of "neighborhood standing" as plaintiff suggests. Lastly, the foreign authorities cited by plaintiff are neither binding nor consistent with Connecticut jurisprudence.
 Plaintiff Lacks Standing To Challenge The Alleged Creation of Easements On Parcel 19
Plaintiff also lacks standing to assert the statutory claims in Count Five against the City and URC regarding the creation of certain easements over Parcel 19 which is owned by the URC (holding title in the name of the City). Since standing to assert those claims is not conferred by statute, Plaintiffs standing to challenge the creation of easements across property in which it holds no legal interest must derive from a taxpayer standing theory or classical aggrievement.
For the same reasons stated above, plaintiff has not established taxpayer standing.
Plaintiff has also failed to show that it has been "classically aggrieved" by the alleged creation of easements across Parcel 19 in favor of 33 BSA and Target. Plaintiff is not a party whose consent is required under Conn. Gen. Stat. § 8-137 for creation of the easements because it is not the "owner of the real property abutting that portion of the street" in which the easements have been created. To the extent that Plaintiff contends generally that the easements will somehow worsen the traffic burden on the surrounding streets, no credible evidence was presented to support this argument. Additionally, increased traffic is clearly not a unique interest "specific" to plaintiff apart from the public at large, and plaintiff has not demonstrated how any unique interest will be "specially" damaged by the challenged easements. See Steeneck, Supra, 235 Conn. 579.
 Plaintiff Lacks Standing to Bring Counts Fifteen and Sixteen
The allegations of the amended complaint admit that the LDA was CT Page 13931 superceded by the 1998 Settlement Agreement. Because Plaintiff has not alleged that it is a third party beneficiary of the 1998 Settlement Agreement, it does not have standing to bring Counts fifteen and sixteen.
 CONCLUSION
For all of the foregoing reasons, Counts One through Eight and Counts Fifteen and Sixteen of Plaintiffs Amended Complaint must be dismissed based on lack of subject matter jurisdiction.
 ___________________ ROGERS, J. SUPERIOR COURT JUDGE